405 S.E.2d 15

Timothy MAYLES, Appellee,

v.

SHONEY'S, INC., a Corporation, d/b/a Captain D's; Fred Hunt; Edward and Hotchkiss, Inc.; and Wayne Phillips, Defendants Below; Shoney's, Inc., a Corporation, d/b/a Captain D's, Appellant.

No. 19530.

Supreme Court of Appeals of West Virginia.

Dec. 20, 1990.

Rehearing Denied Feb. 6, 1991.

Charles E. Hurt, Victor A. Barone, Charleston, for Shoney's Inc.

Paul T. Camilletti, Camilletti & Sacco, Wheeling, David Camilletti, Glenville, for Timothy Mayles.

WORKMAN, Justice:

This case is before the Court upon the appeal of Shoney's, Inc. d/b/a Captain D's from a February 2, 1989, final order of the Circuit Court of Kanawha County, West Virginia, in which the lower court entered judgment on a jury verdict awarding $220,-000.00 to the appellee, Timothy Mayles, as a result of a *Mandolidis*[1]-type personal injury case brought under W.Va.Code § 23–4–2 (1983). The appellant alleges that the following errors were committed by lower court:

> 1) the trial court allowed the jury to decide a case which did not satisfy the mandatory five-factor test set forth in West Virginia Code § 23–4–2(c)(2)(ii) governing Mandolidis cases [in that t]he case may have satisfied a standard for ordinary negligence or carelessness but did not come close to the requirements set forth in said statute for proof of 'deliberate intent', and therefore, should not have been allowed to go to the jury;

> 2) the court, over appellant's objection, gave an instruction that advised the jury that in order to show deliberate intent, the appellee 'need only prove' each of the five statutory elements in Code § 23–4–2(c)(2)(ii), whereas the statutory language is that the 'requirement [proof of deliberate intent] may be satisfied only if [certain requirements are met]'; and

> 3) the court, over the [appellant's] objection, gave an instruction that advised the jury that it could, in determining damages, consider the probable life expectancy of the plaintiff, even though no mortality tables or any other evidence of life expectancy was ever offered.

Upon a review of all the matters of record, including the briefs of the parties, we find that no error was committed by the lower court and accordingly affirm that decision.

The evidence at trial revealed that the appellee, Timothy Mayles, was employed at a Captain D's restaurant in Star City, West Virginia. The appellee had been hired by the restaurant in mid-March of 1984 as a short-order cook. On April 4, 1984, the appellee was severely injured at work while carrying a large five-gallon container of hot grease to a disposal unit located outside the restaurant. The appellee testified that while he was carrying the container to the disposal unit, he slipped and fell on a wet grassy slope and was burned when the grease splashed out of the container and fell onto him. The severity of the appellee's injury is uncontested. The incident caused the appellee to suffer severe burn injuries with disfiguring scarring involving the right arm and shoulder area, the left upper chest and the left shoulder area. The appellee also suffered less severe burns to his face and legs. He underwent skin grafting and, according to Dr. Jacques Charbonniez, a plastic surgeon who testified at trial, the appellee may expect chronic breakdown of the scar tissue from movement.

According to the appellee's testimony, as part of his employment duties, he was required to dispose of used grease from the fryers and grease bins used to deep-fry foods. However, the appellee testified that he received no training regarding his duties in connection with these bins except that he was told by the unit manager,[2] Fred Hunt, to watch other employees and follow their lead. Mayles testified that the manner in which he viewed the grease being disposed was to "pour the grease from the bottom of the vat into a 5–gallon kettle with two handles and walk it back to the back of the store, out the back door, down the slope and into the 55–gallon drums." Further, the appellee's testimony revealed that no one had instructed him to wait until the grease was cold before carrying it out; and that from his observations, the grease was

**1.** *See Mandolidis v. Elkins Indus., Inc.,* 161 W.Va. 695, 246 S.E.2d 907 (1978).

**2.** According to the testimony of Fred Hunt, each Captain D's was referred to as a unit and he was in control of both the Captain D's in Morgantown and Bridgeport. As unit manager he would oversee operations at both restaurants. Hunt further testified that each store also had managers and assistant managers. Apparently he was acting also as manager in the restaurant in which the appellee's injury occurred.

always immediately disposed of while it was hot. He further testified that on the only occasion on which he actually disposed of grease aside from the day of the accident, the grease was cold.[3]

The appellee's testimony as to the practice of disposing of grease while still hot was corroborated not only by Paul Mayles,[4] his cousin, who was also employed as a short-order cook at the same Captain D's and who observed his cousin's injury when it occurred, but also by Phillip Wakim, another short-order cook employed at the same restaurant. In addition, Terry Franks, who had been unit manager of the Captain D's where the accident occurred until shortly before the appellee was hired and was the dining room supervisor when the appellee began work, testified that the restaurant's policy was to dump the grease while it was hot. Specifically, she testified that "[i]t was just the general feeling around the store that we were always so short on laborers and trying to cut hours that everything was done right now, get it done, get the people off the clock and then that was the end of the day." Her testimony also indicated that other employees had come to her expressing concern that it was unsafe and extremely dangerous to carry hot grease down the slope to discard it; however, she never reported these concerns to the subsequent unit manager, Fred Hunt. Franks also testified that the grease was always taken down the slope to dump it and that alternate routes were not used because the bucket was too hot and heavy and the other routes too long. Finally, Franks' testimony revealed that another employee named Leon Willson, who was another former unit manager, had suffered a foot injury in the same manner as the appellee in December 1983.[5]

Dr. Andrew Sorine, who had a master's degree in Industrial Safety and a doctorate in Safety Management from West Virginia University, testified as an expert for the appellee. Dr. Sorine testified that the restaurant was in violation of Occupation Safety and Health Administration (hereinafter referred to as OSHA) regulations for lack of training of its employees in handling hazardous materials; lack of proper personal protective equipment to be worn when handling hazardous material; and the elevation problem of having to go down a slope to dispose of hot grease. The expert further testified that the specific unsafe working condition found at the injury sight was that Mayles "had to transport a corrosive and dangerous material or substance over a path that was not conducive for ... transportation of that material." His testimony also indicated that this unsafe working condition presented a high degree of risk to employees which included a strong probability of serious injury. Finally, Dr. Sorine testified that the unsafe working condition was in violation of the industry standard since "[t]he industry standards for disposing of the hot grease would have been to drain the grease into a container which could have been tightly sealed and could have transmitted or transferred that hot grease to another container without the possibility of the hot grease escaping the container."

The appellant's case consisted of the testimony of an expert witness and Fred Hunt, the unit manager at Captain D's at the time of the appellee's injury. Hunt testified that he personally went over all the written company policies and procedures with Mayles. Hunt also testified that he personally trained the appellee in

---

**3.** The testimony of the unit manager, Fred Hunt, was that the grease was discarded only once a week on the average, thus explaining why the appellee had only discarded the grease once prior to his injury.

**4.** The testimony of Paul Mayles was that on the day of the accident the appellee was helping him dispose of the grease by opening doors for him. Because it had just rained and the slope was wet, Paul Mayles testified that he wanted to

dump the grease down the slope, but his cousin, the appellee, expressed concern that they would "get in trouble" and was carrying the hot grease down the slope when the incident occurred.

**5.** There was no evidence in the record as to the seriousness of the injury. The testimony did reveal that Willson was treated at a local emergency room and missed a couple of days of work as a result of the injury.

how to empty the fryers.[6] He denied that he instructed Mayles just to watch the other employees and follow their lead. Further, Hunt testified that when he was manager he required the oil to be cooled either in the back storage room or in the freezer prior to being carried out to the disposal unit. He also testified that he and the appellee had carried out oil one day and that the oil was cold. He indicated that an alternate route which did not involve going down the slope was used.[7] Hunt's testimony also revealed that he had heard rumors that hot oil was being disposed of behind his back; but that he took no measures to correct the situation until after Mayles' injury. Additionally, Hunt also testified that when the appellee was injured, while he did not actually see the appellee disposing of the hot oil, he did hear them while they were disposing of it. He thought that the grease was being placed in an area to cool and not being carried outside. Finally, Hunt testified that he was never informed that another employee had previously been injured in the same manner as Mayles, as this event occurred about four months prior to his becoming unit manager of the store.

Appellant's expert, David Pierce, who was a safety engineer for a private consulting firm and a former compliance officer with OSHA, testified that there were no specific violations of OSHA regulations. He testified that the violations found by appellee's expert pertained to corrosive materials and it was his opinion that hot grease did not qualify as a corrosive material under the OSHA regulations;[8] that protective gear would only be required in the transfer of the hot grease from one container to another; and that the only even arguable violation would be of the general duty clause found in the OSHA regulations which simply guarantees each worker a safe and healthful place to work.

At the close of all the evidence the jury deliberated and returned a verdict in favor of the appellee in the amount of $220,-000.00. It is from this verdict that the appellant alleges error.

## I.

As a backdrop to our discussion of the issues raised in this case, it is important to note the history of *Mandolidis*-type claims in this state. Historically, the primary purposes of workers' compensation statutes has been to provide benefits and full compensation to persons injured in their workplace as well as to protect employers from the financial consequences of civil liability to injured employees. *Mandolidis v. Elkins Indus., Inc.*, 161 W.Va. 695, 698–701, 246 S.E.2d 907, 910–11 (1978); *see* W.Va. Code § 23–4–2(c)(1).

The West Virginia Workers' Compensation Act from its inception, however, has contained an exception to an employer's immunity from litigation. The exception is that "[i]f injury or death result to any employee from the deliberate intention of his employer to produce such injury or death, the employee ... shall ... have cause of action against the employer ... for any excess of damages over the amount received or receivable under this chapter." W.Va.Code § 23–4–2(b).

We interpreted the "deliberate intention"

---

**6.** Hunt's testimony indicated that the restaurant had seven fryers. There were two large fryers used for cooking fish and chicken. The two medium and three small fryers were utilized for frying french fries, shrimp and clams. It appeared from the testimony that during peak hours all the fryers were operational since each fryer had a particular use. Finally, Hunt testified that the grease disposal occurred after peak hours at the restaurant. This testimony of when the grease disposal occurred is consistent with the testimony of both Paul Mayles and the appellee, who testified that the injury occurred when grease was being disposed after a rush

period had ended. The appellee's injuries occurred while disposing of the grease from a large fryer.

**7.** The appellee's testimony indicated that the cold grease was taken down the grass slope on this occasion.

**8.** The appellant's expert, Pierce, defined a corrosive material as "a substance which will cause either irreparable damage to tissue or one that will cause damage that must be repaired in a medical sense."

portion of W.Va.Code § 23–4–2 [9] in the *Mandolidis* case. The plaintiff in that case lost two fingers and part of his hand while operating a table saw which was not equipped with a safety guard. 161 W.Va. at 707, 246 S.E.2d at 914. The plaintiff alleged that the defendant knew that the lack of a safety guard constituted violations of state and federal safety violations along with accepted industry standards. Further, the plaintiff asserted that other employees had been injured as a result of the absence of the safety guard and when the plaintiff objected to operating the machine because of safety concerns, the defendant threatened to fire him. Finally, the plaintiff alleged that just prior to his injuries, the defendant had been cited for OSHA violations by federal inspectors due to the lack of a safety guard on the saw. The defendant subsequently installed a guard of an incorrect type, but shortly thereafter ordered it removed to increase production speed. *Id.* 161 W.Va. at 707–08, 246 S.E.2d at 915. In that decision we held that "the phrase 'deliberate intent to produce such injury or death' must be held to mean that an employer loses immunity from common law actions where such employer's conduct constitutes an intentional tort or wilful, wanton, and reckless misconduct." *Id.* 161 W.Va. at 707, 246 S.E.2d at 914 (footnote omitted).

■ Because of the *Mandolidis* decision, the legislature decided to amend the statute in an attempt to make it more difficult for an employer to lose the immunity provided to him by the Workers' Compensation Act. *See Riggle v. Allied Chem. Corp.*, 180 W.Va. 561, 564 n. 7, 378 S.E.2d 282, 285 n. 7 (1989). Further, the Fourth Circuit Court of Appeals in *Handley v. Union Carbide Corp.*, 804 F.2d 265 (4th Cir.1986) in interpreting the amended statute indicated that

> [t]he statute now states that 'in enacting the immunity provisions of this chapter, the legislature intended to create a legislative standard for loss of that immunity

of more narrow application and containing more specific mandatory elements than the common law tort system concept and standard of willful, wanton and reckless misconduct.'

*Id.* at 269 (quoting W.Va.Code § 23–4–2(c)(1)). The statute creating a legislative standard for loss of employer immunity from civil liability for work-related injury to employees found in W.Va.Code § 23–4–2 essentially sets forth two separate and distinct methods of proving "deliberate intention":

> (2) The immunity from suit provided under this section and under section six-a [§ 23–2–6a], article two of this chapter, may be lost only if the employer or person against whom liability is asserted acted with 'deliberate intention.' This requirement may be satisfied only if:
>
> (i) It is proved that such employer or person against whom liability is asserted acted with a consciously, subjectively and deliberately formed intention to produce the specific result of injury or death to an employee. This standard requires a showing of an actual, specific intent and may not be satisfied by allegation or proof of (A) conduct which produces a result that was not specifically intended; (B) conduct which constitutes negligence, no matter how gross or aggravated; or (C) willful, wanton or reckless misconduct; *or*
>
> (ii) The trier of fact determines, either through specific findings of fact made by the court in a trial without a jury, or through special interrogatories to the jury in a jury trial, that all of the following facts are proven:
>
> (A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;
>
> (B) That the employer had a subjective realization and an appreciation of the existence of such specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by such specific unsafe working condition;

**9.** While in *Mandolidis* we actually interpreted W.Va.Code § 23–4–2 (1969) as it existed prior to the 1983 amendment, for the purposes of this opinion the deliberate intention language quoted in the text above is the same in both statutes.

(C) That such specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of such employer, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions;

(D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C) hereof, such employer nevertheless thereafter exposed an employee to such specific unsafe working condition intentionally; and

(E) That such employee so exposed suffered serious injury or death as direct and proximate result of such specific unsafe working condition.

W.Va.Code § 23–4–2(c)(2)(i) to (ii) (emphasis added).

We have not previously had an opportunity to address the issue of what is required to prove "deliberate intent" as outlined in W.Va.Code § 23–4–2(c)(2)(ii).

In the present case, the appellee sought to prove "deliberate intention" by the five-part test enunciated in W.Va.Code § 23–4–2(c)(2)(ii). Appellant in the first assignment of error essentially contends there was insufficient evidence to support presentation of this issue to the jury. The appellant further contends that the deliberate intent portion of W.Va.Code § 23–4–2 must be equated to "wilful, wanton or reckless misconduct" as enunciated previously by this Court in the *Mandolidis* decision. Based upon this interpretation, appellant contends that at best, Shoney's was lax in training its employees and was negligent in failing to correct an unsafe practice; and that there was no evidence to support wilful, wanton or reckless misconduct.

Also, the appellant asserts that the appellee had to satisfy the five-part test

found in W.Va.Code § 23–4–2(c)(2)(ii) as to each unsafe working condition; that appellee alleged more than one unsafe condition; and failed to prove all the above conditions for each unsafe condition. Appellant broke down the conditions alleged as follows: 1) carrying of hot grease; 2) inadequate container—no lid or tag; 3) wet, grassy slope; and 4) lack of personal protective equipment. The appellant also argues that appellee failed to prove violation of any specific OSHA regulations as to the unsafe condition and at most only showed a potential violation of a general provision not sufficient to satisfy the statute.

The appellee, on the other hand, argues that evidence to support all the requirements of the statute was presented at trial, and that a jury verdict should not be lightly overturned. Additionally, the appellee asserts as to the contested areas that: 1) the deliberate intent requirement of the statute was met by proving each element enunciated in W.Va.Code § 23–4–2(c)(2)(ii); and 2) the OSHA regulations shown to have been violated by appellee's expert at trial were specific violations; but that even if this Court finds they were not, the expert also testified that the restaurant was in violation of a specific safety standard within the industry on the disposal of hot oil.

Similarly, in *Handley v. Union Carbide Corp.*, 620 F.Supp. 428 (S.D.W.Va.1985), *aff'd*, 804 F.2d 265 (1986), the district court was asked to consider whether the plaintiff-employee had presented sufficient evidence to prove each of the elements of the five-part test found in W.Va.Code § 23–4–2(c)(2)(ii). The court meticulously went through all the evidence presented by the plaintiff at trial pertaining to exposure to several different chemicals. Based upon this review, the district court determined that the plaintiff had proven all the elements contained within the statute with the exception of that found at W.Va.Code § 23–4–2(c)(2)(ii)(C) [10] as that provision related to the plaintiff's exposure to the

---

**10.** *See also Grene v. Carolina Freight Carriers,* 663 F.Supp. 112 (S.D.W.Va.1987) where the district court again found that the plaintiff failed

to meet the requirement enunciated in W.Va. .Code § 23–4–2(c)(2)(ii)(C).

chemical silicon tetrachloride. *Id.* at 436–40.

With regard to the plaintiff showing that his employer violated either a safety statute or regulation or a commonly accepted industry or business practice concerning safety, the court found that

[t]here was absolutely no evidence produced that Carbide [the employer] had violated 'a state or federal safety statute, rule or regulation, whether cited or not.' Indeed, the Plaintiffs concede that they must rely upon a violation of a 'commonly accepted and well-known safety standard within the [chemical industry].' Their proof and theory on this point, however, are tenuous at best.

*Id.* at 438. The tenuous proof referred to by the district court was "a one-page Carbide safety sheet on the chemical silicon tetrachloride" which did not reflect a commonly accepted industry standard but merely the practices of the company involved.[11] *Id.*

Likewise, we must review whether the appellee introduced sufficient evidence at trial to support a jury verdict as to each requirement involved in the statutory five-part test.

### A. Specific Unsafe Working Conditions

■ The first requirement involved is that a specific unsafe working condition presenting a high degree of risk and strong probability of harm or serious injury to the employee must have existed in the workplace. W.Va.Code § 23–4–2(c)(2)(ii)(A). The specific unsafe working condition alleged was the manner in which hot grease was disposed. The appellee's evidence indicated that the disposal was performed by carrying hot[12] grease in a five-gallon open container down a grassy slope in order to discard the material in fifty-five-gallon drums. Particularly, the appellee's expert testified that the grassy slope had a seven or eight foot drop covering approximately thirty-two to thirty-four feet in elevation and that transportation of hot grease over this path in a container with no lid presented a high degree of risk to employees charged with grease disposal. He further testified that this condition presented a strong probability of serious injury to the employee.

### B. Subjective Realization

The second requirement involves proof of a subjective realization and an appreciation by the employer of the existence of the unsafe working condition and the high degree of risk and strong probability of serious injury presented by such condition. *Id.* § 23–4–2(c)(2)(ii)(B). Appellee's evidence at trial showed that it was the general practice of employees to take the five-gallon container of hot grease out the back door and down the hill in a container without a lid. Further the testimony elicited from Fred Hunt, the unit manager at time of the accident, was that there was a "do everything right now" policy even in the disposal of the grease; but that he had attempted to change this policy. The existence of this "do everything right now" policy was corroborated by former unit manager Terry Franks. The unit manager's testimony also reflected that, prior to Mayles' accident, he had heard "rumors" that the hot oil was still being disposed of before it was cooled; and that although he "was making plans and preparation to do something about it[,]" no such action had been taken. There was also testimony from Paul Mayles that during the six-month period in

---

**11.** This finding by the district court was upheld by the Fourth Circuit Court of Appeals. Particularly, the Fourth Circuit held that

[i]t would be rare that a 'commonly accepted and well-known' safety standard could be established by showing that it exists in only one facility. Occupational safety standards may vary across, or perhaps within, geographical regions of even the same industry. Before such a standard could be fairly characterized 'as commonly accepted and well-known' there must be at least some evidence that an equal or similar standard was in place or recognized by a business or industrial entity conducting the same or similar activities as the defendant. Without such evidence, there seldom will be a jury question presented under subsection (C).

*Handley,* 804 F.2d at 273.

**12.** The appellee's evidence below was that generally the grease was approximately 365° Fahrenheit at the time of its disposal.

which he had worked at the restaurant, he had told the assistant manager that he felt the way the grease was being disposed of was unsafe; however, again no action was taken by the management to remedy the situation. Finally, there was testimony by Terry Franks that another employee had been injured in a manner similar to the appellee in December 1983.[13] Franks also testified that the disposal of the hot grease was always done by carrying it down the grassy slope behind the building to the disposal unit. The appellee's injury occurred in April 1984. Certainly this evidence establishes that the management had "a subjective realization and an appreciation" of the dangers of the unsafe working condition on behalf of the employer.[14]

### C. Violation of Safety Statute or Standard

The third requirement of the statute involves proof that the specific unsafe working condition constituted a violation of a state or federal safety statute whether cited or not, or constituted a violation of a commonly accepted and well-known safety standard within the industry or business of the employer which statute or standard was specifically applicable to the particular working condition involved, as contrasted with a statute or standard generally requiring safe working conditions. *Id.* § 23–4–2(c)(2)(ii)(C). The appellee's expert testified at trial that the following OSHA regulations had been violated: 1) 29 C.F.R. 1910.22 (1983), which requires work places be kept clean and sanitary; 2) 29 C.F.R. 1910.37 (1983), which requires that exterior ways of exit access be substantially level and if there is a change in elevation, such elevation shall be negotiated by a stair or ramp; 3) 29 C.F.R. 1910.132 (1983), which requires that personal protective equipment be worn when handling hazardous materials; and 29 C.F.R. 1910.145 (1983), which requires that cans be labeled and danger signs be placed to define specific hazards and hazardous materials. The appellant attempted to refute these violations through their own expert testimony which indicated that the potential violations presented by the appellee pertained to corrosive material[15] and that it was his opinion the hot grease was not corrosive for the purposes of the regulations. Moreover, the only possible violation which occurred was of the general duty clause which guarantees each worker a safe and healthful place, but a violation of this regulation alone is insufficient to prove the requirement of the statute.

Significantly, the appellee's expert further testified that in addition to the specific OSHA violations, the grease disposal practice was also in violation of a commonly accepted and well-known safety standard within the industry or business of the employer. Specifically, the appellee's testimony was that based on his background in the restaurant industry[16] "[t]he industry standards for disposing of the hot grease would have been to drain the grease into a container which could have been tightly sealed and could have transmitted or transferred that hot grease to another container without the possibility of the hot grease escaping the container." The appellant put on no evidence to contradict that this was the standard for the restaurant industry. Consequently, we find that the appellee sufficiently proved this statutory requirement.

**13.** Although there is no evidence in the record that would indicate the accident in December 1983 caused serious injury, certainly it is obvious that carrying a five-gallon container of 365° degree Fahrenheit grease produced a high degree of risk and a strong probability of serious injury.

**14.** A corporation is liable for wrongs committed by agents within the scope of their employment. *See Lyons v. Davy–Pocahontas Coal Co.*, 75 W.Va. 739, 744, 84 S.E. 744, 746 (1915).

**15.** The appellee's expert testified that in " 'Labeling Standard for Protection of Employees from Hazardous Materials, subpart B Labels, Standards Advisory Committee' " a corrosive material was defined as a "material that causes destruction of living tissue by chemical action."

**16.** The appellee's expert testified that his mother and uncle owned a family restaurant for the past twenty years and that he actively participated in its operation. Further, he personally owned and operated a restaurant bar and lounge for four years. Both operations utilized deep fryers.

### D. Intentional Exposure

The fourth statutory requirement is that the employer must have, in light of the preceding requirements, intentionally exposed the employee to the specific unsafe working condition. W.Va.Code § 23–4–2(c)(2)(ii)(D). We find that this fact was proven at trial in light of the evidence that management at the restaurant knew *how the employees were disposing of the grease*, knew that a previous employee had been injured by such practice, had received employee complaints about the practice, and still took no action to remedy the situation.[17]

### E. Injury Direct & Proximate Result

The final requirement in the statute is that the employee's injury must have occurred as a direct and proximate result of the unsafe working condition. *Id.* § 23–4–2(c)(2)(ii)(E). Clearly there was sufficient evidence presented from which the jury could conclude that the employee was following the procedure utilized in the restaurant to dispose of the grease, that his injuries were serious and that they were the direct and proximate result of the unsafe working condition.

The statute requires that the trier of fact, in this case the jury, determine whether the above-mentioned requirements are proven through special interrogatories. *Id.* § 23–4–2(c)(2)(ii). In this case, the jury, utilizing the special interrogatories, found for the appellee. We have previously stated that when presented with the issue of whether there was sufficient evidence to sustain a jury verdict "[w]e recognize that in view of a favorable jury verdict, the facts must be construed in the light most favorable to the plaintiff." *Cline v. Joy Mfg. Co.*, 172 W.Va. 769, 771, 310 S.E.2d 835, 837 (1983) (citing *Wager v. Sine*, 157 W.Va. 391, 201 S.E.2d 260 (1973); *Lambert v. Goodman*, 147 W.Va. 513, 129 S.E.2d 138 (1963)). We find that there was sufficient evidence to sustain the jury verdict in this case.

■ Thus we conclude that a plaintiff employee may establish "deliberate intention" in a civil action against an employee for a work-related injury by offering evidence to prove the five specific requirements provided in W.Va.Code § 23–4–2(c)(2)(ii).

Ironically, this is not the sort of case wherein, under all the facts and circumstances, the appellee could probably have prevailed under the extremely narrow concept of deliberate intent enunciated in *Mandolidis*. *See* 161 W.Va. at 698, 246 S.E.2d at 907. The reason the appellee would likely have been unsuccessful under *Mandolidis* is because we do not perceive this as the type of injury "result[ing] from wilful, wanton or reckless misconduct [where] such ... injury [wa]s no longer accidental in any meaningful sense of the word, and [therefore] must be taken as having been inflicted with deliberate intention ..." *Id.* 161 W.Va. at 705, at 914. However, the legislature, in an apparent effort to narrow the parameters of civil liability for employers, has indeed broadened the concept by enactment of the five-part test of W.Va. Code § 23–4–2(c)(2)(ii).

## II.

■ The appellant next claims that the *appellee's instruction 1A departed from the statutory language and minimized appellee's burden of proof below.* Specifically, the appellant claims the jury was instructed that the plaintiff "need only prove" the five statutory elements and that they should have been instructed that the plaintiff "must prove" the elements. The jury instruction at issue is as follows:

Before you can find for the plaintiff you must find that the defendants acted with deliberate intent. To prove deliberate intent, it is not necessary for the plaintiff to show that Shoney's acted with a purpose or design to injury Tim Mayles. *Rather, to prove deliberate in-*

---

**17.** *The evidence at trial obtained through the appellant's examination of the restaurant manager was that subsequent to the appellee's injury the following remedial measures were instituted:* 1) *the fifty-five gallon disposal bins were* brought up next to the building so that there was no longer a need to go down the slope; 2) the manager ordered safety items and posters for the employees concerning the handling of hot grease.

*tent in this case, the plaintiff need only prove each of the following five statutory elements:*

(A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

(B) That the employer had a subjective realization and an appreciation of the existence of such specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by such specific unsafe working condition;

(C) That such specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of such employer, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions;

(D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C) hereof, such employer nevertheless thereafter exposed an employee to such specific unsafe working condition intentionally; and

(E) That such employee so exposed suffered serious injury or death as a direct and proximate result of such specific unsafe working condition.

If you find that each of these elements, A through E, has been proved by the evidence, then you have found that Shoney's d/b/a Captain D's, acted with deliberte [sic] intention in causing plaintiff's injuries and thus is subject to a judgment for damages in favor of the plaintiff in excess of any award by Workers Compensation.

(emphasis added and citation omitted). We find that there was no error in the giving of this instruction as it states accurately the five elements which must be proved and the words "need only prove" were used to explain that no higher burden existed.

### III.

The last assignment of error is that the appellant offered no mortality table or any other evidence of life expectancy and that appellee's instruction told the jury it could consider plaintiff's life expectancy.[18] The appellee contends that West Virginia does not require life expectancy tables before a jury can award damages for permanent injury.

A review of the record reveals that the evidence introduced by the appellee at trial indicated, according to the appellee's medical expert, that the burn injury would not affect the appellee's life expectancy as it was not a life shortening injury. The pertinent jury instruction stated that the jury *"may* take into consideration [the appellee's] age and physical condition and the probable duration of his life under all the evidence in this case." (emphasis added). All the evidence in this case indicated that his life expectancy was not affected and therefore there was never a need for mortality tables. Thus, we find that this assignment of error is without merit.

Based upon the foregoing opinion, the judgment of the Circuit Court of Kanawha County is hereby affirmed.

Affirmed.

---

**18.** Plaintiff's instruction no. 2 given at trial was:

If your verdict is against the defendant, Shoney's d/b/a Captain D's, your verdict should be adequate to fairly compensate plaintiff, over and above the Workers' Compensation benefits he has received.

A verdict in favor of Tim Mayles should compensate him for any:

1. Pain, suffering, humiliation, disadvantage, and loss of enjoyment of life prior to trial.

2. Future loss of enjoyment of life, including humiliation, embarrassment and disadvantage which you believe is reasonably certain. In this connection, you may take into consideration his age and physical condition and the probable duration of his life under all of the evidence in this case.

3. Permanent, physical and mental injuries and past injuries, or both.

NEELY, Chief Justice, dissenting:

In my dissent in *Mandolidis v. Elkins Industries*, 161 W.Va. 695, 246 S.E.2d 907 (1978), I expressed concern that the majority's approach to procedure threatened to undermine the entire workers' compensation system. I have the same concern now. *Mandolidis* involved three different cases in which workers claimed to fall within the "deliberate intent" exception to employer liability. In all three cases, the lower courts had granted summary judgment to the employer. On appeal, the majority reversed the granting of summary judgment, and held that all three cases should have gone to a jury. They did so because they believed that in each case the plaintiff *alleged* sufficient facts to be allowed an opportunity to develop facts.

However, of the three claimants, only Mr. Mandolidis alleged facts that demonstrated to me that there was "deliberate intention" on the part of the employer. Mr. Mandolidis was the victim of an accident resulting from a level of willful, wanton, and reckless disregard for human safety that amounted to "deliberate intention", while the other two claimants suffered from accidents resulting simply from some degree of negligence.

The problem with allowing weak "deliberate intention" cases to get to the jury is that juries have sympathy for injured workers and no sympathy for big employers and insurance companies. If you allow 100 "deliberate intention" cases involving big employers like Shoney's, Inc., to get to juries, you will get some substantial number of groundless verdicts for the plaintiffs.[1] More important, however, than the

cases that are tried are the cases that are settled. *Mandolidis* was an economic disaster for this state not because employers feared judgments, but because employers feared run away lawyers' bills and routine nuisance suit settlements and hefty new insurance premiums in addition to workers' compensation to protect against possible loss of compensation immunity.

I like wealth re-distribution as much as the next man, but the simple fact is that the statute applied in this case was not intended to provide for wealth redistribution, but rather to *prevent excessive* wealth redistribution. Indeed, the statute was passed in response to the majority's opinion in *Mandolidis* and the statute attempted to instantiate the notions I had articulated in my *Mandolidis* dissent. If juries make mining operators or manufacturers pay huge awards, the manufacturers will move out of West Virginia, or go out of business completely, while new mine operators will be reluctant to come here. At any rate, jobs will flee the State. Indeed, this was what was happening under *Mandolidis*, which is why the legislature amended the statute in 1983 *with the willing and eager support of the West Virginia AFL–CIO.*

In my *Mandolidis* dissent I complained that the majority appeared to be waiting for an opportunity to create a new legal fiction of "constructive intent to injure". Today's majority has found that fiction codified in the five-part test of amended *W.Va.Code* 23–4–2(c)(2)(ii) [1983]. By their reading, the jury makes the determination of whether the employer loses immunity,

---

1. In addition, juries likely would be overly generous to injured employees of large employers. In *Lehman v. Nakshian*, 453 U.S. 156, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981), the U.S. Supreme Court held that where Congress waives the Government's immunity from suit, the plaintiff has a right to a jury trial only where Congress has affirmatively and unambiguously granted that right by statute. In regard to excessive jury verdicts, the Court said:

It is not difficult to appreciate Congress' reluctance to provide for jury trials against the United States. When fashioning a narrow exception to permit jury trials in tax refund

cases ... Congress expressed its concern that juries "might tend to be overly generous because of the virtually unlimited ability of the Government to pay the verdict." *Id.* at 161 n. 8, 101 S.Ct. at 2702 n. 8. The Court then noted that the narrow exception allowing jury trials in tax refund cases was passed only after much delay and debate, and after the reluctant House conferees became convinced that there would be no danger of excessive jury verdicts because recoveries would be limited to the amount of taxes illegally or erroneously collected. *Id.*

i.e., whether the case can go to a jury.[2] The statute does contain a technical flaw, in that at one isolated point (if one is innocent of this statute's tumultuous history) it appears to place the decision as to whether the employer is subject to suit under the five-part test of *W.Va.Code* § 23–4–2(c)(2)(ii) in the hands of the trier of fact, whether that be judge or jury.

However, exactly because the drafters of the new law, *W.Va.Code* 23–4–2 [1983], feared that the Court would deliberately misinterpret their amendment to reinstate the "constructive deliberate intent to injure" cause of action that had worked such economic destruction in this state for five years, the legislature made their intentions clear in *W.Va.Code* 23–4–2(c)(1) [1983]:

> It is declared that enactment of this chapter and the establishment of the workmen's [workers'] compensation system in this chapter was and is intended to *remove from the common law tort system all disputes* between or among employers and employees regarding the compensation to be received for injury or death to an employee except as herein expressly provided, and to establish a system which compensates even though the injury or death of an employee may be caused by his own fault or the fault of a co-employee; that the *immunity* established in sections six and six-a [§§ 23–2–6 and 23–2–6a], article two of this chapter, is an *essential* aspect of this workmen's [workers'] compensation system; that the intent of the legislature in providing immunity from common law suit was and is to protect those so immunized from litigation outside the workmen's [workers'] compensation system except as herein expressly provided; that, in enacting the immunity provisions of this chapter, the legislature intended to create a legislative standard for loss of that immunity of more *narrow application and containing more specific mandatory elements than the common law tort system concept and standard of willful, wanton and reckless misconduct; and that it was and is the legislative intent to promote prompt judicial resolution of the question of whether a suit prosecuted under the asserted authority of this section is or is not prohibited by the immunity granted under this chapter.*

The legislative intent as clearly expressed above should inform any reading of *W.Va.Code* 23–4–2(c)(2)(ii) [1983]. Thus, any reading of the latter provision that would *broaden* the definition of "deliberate intention" is patently *wrong*. First, "prompt *judicial* resolution", in light of the overall legislative history of the amendment, can only be a determination made by a *judge*. Second, the practical effect of letting the jury decide what cases are "deliberate intention" cases certainly is to broaden substantially the "deliberate intention" exception. Even the majority admits:

> Ironically, this is not the sort of case wherein, under all the facts and circumstances, the appellee could probably have prevailed under the extremely narrow concept of deliberate intent enunciated in *Mandolidis. See* 161 W.Va. at 698, 246 S.E.2d at 907. The reason the appellee

---

**2.** The problem with having the determination of employer immunity from suit done at the tail end of the litigation is obvious. Without a threshold determination by the trial court, nuisance suits will plague employers with high litigation costs.

In F. Haas, *On Reintegrating Workers' Compensation and Employers' Liability*, 21 Ga.L.Rev. 843 (1987), Professor Haas discusses the problem of nuisance suits by injured workers. An injured worker who has had his expenses taken care of by workers' compensations is in a good position to bring a nuisance suit, and wait around for a high settlement. The author, in his proposal for a dual system of tort liability and workers' compensation for work-related ac-

cidents, makes it clear that some kind of threshold determination is necessary to prevent nuisance suits. *Id.,* 891–893.

While Professor Haas seems mainly concerned with problem of small nuisance suits, I do not think that a mechanical threshold test, like an amount in controversy requirement, would solve the problem of *large,* but ultimately groundless, claims. First, the employer will have to defend those even more vigorously than the small ones. Second, American juries are known throughout the world for their generosity, so that without a threshold determination by a judge, juries often are going to make large awards in cases that never should have reached them.

would likely have been unsuccessful under *Mandolidis* is because we do not perceive this as the type of injury "result[ing] from wilful, wanton or reckless misconduct [where] such ... injury [wa]s no longer accidental in any meaningful sense of the word, and [therefore] must be taken as having been inflicted with deliberate intention...." *Id.* 161 W.Va. at 705, 246 S.E.2d at 914.

*Mayles v. Shoney's,* 185 W.Va. 88, 405 S.E.2d 15 (1990) (Workman, J.). The majority then goes on to make a curious pronouncement:

> However, the legislature, in an apparent effort to narrow the parameters of civil liability for employers, has indeed broadened the concept by enactment of the five-part test of W.Va.Code § 23–4–2(c)(2)(ii)." [3]

*Id.* 185 W.Va. at 96, 405 S.E.2d at 23–24.

Thus, like the malevolent genie, who, after telling the finder of the lamp to make three wishes, then seizes on any ambiguity in the finder's expression of his wishes to play ironic practical jokes, the majority knows exactly what the legislature meant to do with the amendment, and interprets the language so as to defeat the legislature's express purpose.

For the statute to operate as the legislature intended, there must be a threshold determination *by the trial court* that the accident resulted from either "deliberate intention", or, alternatively, that all of the elements of the five-part test are met.

In affirming the jury verdict in this case, the Court found that Shoney's had a "subjective realization" of the "high degree of risk" and "strong probability of serious injury or death." I strongly disagree, and would hold that, as a matter of law, subsection (B) of the five part test was not met. I would also hold that, as a matter of law, Shoney's management's conduct did not amount to "intentional exposure", under subsection (D).

Subsection (B) requires "*subjective* realization", and not merely "*objective* realization." Even if the "reasonable man" would have realized the existence of a dangerous condition in the workplace and the high degree of risk associated with that condition, the specific real life defendant in this case did not meet subsection (B), and thus retains immunity from civil action. For the employer to lose immunity, he must have demonstrated that he *knew* of the dangerous condition and appreciated the high degree of risk. Thus, our compensation law is particularly (and rightfully) protective of the stupid; only the *malicious* employer loses his immunity. The claimant has not shown that Shoney's management knew of the dangerous condition and realized how dangerous it was.

"Deliberate exposure" is, likewise, a difficult test to meet. "Deliberate" means that the decision to expose employees to the dangerous condition was something that management thought about for at least a moment or two. (Like malice in murder, the thought must have been around for at least the twinkling of an eye.) Thus "deliberate exposure" requires a conscious decision on the part of management. The record does not disclose a conscious decision on the part of management to expose employees to the particular dangerous condition of carrying hot grease down a grassy slope. Indeed, the record conclusively demonstrates that workers were provided a perfectly safe, paved passage that completely avoided the grassy slope.

Perhaps the chain of communication should have been better so that Mr. Hunt would have been aware of potentially dangerous practices in the workplace. Perhaps Mr. Hunt should have watched the employees constantly to make sure that they always did things the correct and safe way. However, any misconduct on the part of management constituted negligence, at worst. Indeed, to reiterate, stupidity is a quality expected of both employers and employees under the workers' com-

---

**3.** If the Court admits that this claimant would be able to avail himself of the "deliberate intention" exception, under the *Mandolidis* court's view, but believes that under the amended stat-

ute, which was intended to narrow the exception, the claimant prevails, the majority has reached the wrong result.

pensation statutes and both are protected from being penalized for it: The worker recovers even if the accident was entirely his fault, and the employer is still immune from common law suit even if he walks around all day wearing a dunce cap!

Mr. Mandolidis' plant foreman, on the other hand, *knew* that running a table saw without a guard was extremely dangerous to the saw's operator, and *insisted that it be run without the guard.* Further, the plant foreman and the plant manager affirmatively demonstrated that they did not care if a saw operator was injured from an unguarded saw. In response to numerous complaints about the dangerous condition, the plant foreman and plant manager "hee-hawed", apparently taking sadistic pleasure in the uneasy position of the saw operators. Furthermore, after a plant inspector shut down a guardless saw and placed on it an "out of order" sign, the foreman took the sign off and placed the saw back in operation. Such conduct shows both "subjective realization" of the dangerous condition, and a reckless disregard for human life that rises to the level of "malice". And, indeed, that is what needs to be shown for there to be a "deliberate intention" case.

Mr. Hunt's conduct in this case is to the conduct of Mr. Mandolidis' plant manager and foreman as night is to day. Not only does it appear that Mr. Hunt lacked a subjective realization of the dangerous condition and the degree of risk; Mr. Hunt certainly did not *intentionally* expose plaintiff to the danger. Where Mr. Mandolidis was expressly threatened with firing if he did not go ahead and operate the highly dangerous unguarded saw, Mr. Hunt never said to plaintiff, "You take that oil out while it's hot, and you better take it down the grassy slope, or you're fired." The "Get it done now" attitude alleged in this case does not rise to the level of "deliberate exposure." Indeed, the slothful law clerk who drafted this opinion has heard the same admonition three times today! The record shows that the employer provided a perfectly safe way to dispose of the oil. It could have been carried out after it was cooled, and it could have been carried to the fifty-five gallon drum by a much safer path than the grassy slope, and such a path was provided by the employer.

Examining the amended statute and the facts of this case, one can conclude only that the management, although perhaps negligent in some respects, did not engage in the level of "willful, wanton and reckless misconduct" that the drafters of the amended statute envisaged as triggering loss of employer immunity from suit.

I am authorized to say that Justice BROTHERTON joins me in this dissent.