408 S.E.2d 385

**Jerry Ray BLEVINS, Plaintiff Below, Appellant,**

v.

**BECKLEY MAGNETITE, INC. Defendant Below, Appellee.**

**No. 19654.**

Supreme Court of Appeals of West Virginia.

Submitted May 8, 1991.

Decided July 29, 1991.

Rehearing Denied Sept. 5, 1991.

Richard E. Hardison, Beckley, for appellant.

Clyde A. Smith, Jr., Beckley, for appellee.

WORKMAN, Justice:

This case is before the Court upon the appeal of Jerry Ray Blevins from a June 9, 1989, final order from the Circuit Court of Raleigh County, which granted the appellee's, Beckley Magnetite Inc., motion to set aside the jury verdict and enter judgment for the appellee notwithstanding the jury verdict. The appellant asserts that the lower court committed the following errors:

1) The circuit court erred in its finding of facts and in its conclusion thereon that appellee, Beckley Magnetite, Inc., did not have knowledge of the high degree of risk and strong probability of injury as a result of the specific unsafe working condition that existed in the workplace;

2) The circuit court erred in finding that the appellee did not have subjective realization and appreciation of the existence of an unsafe working condition and that it presented a high risk and strong probability of serious injury; [and]

3) The circuit court erred in its application of the statute and its concomitant conclusion that the employer did not act with a consciously, subjectively and deliberately formed intention to injure the appellee.

Based upon a review of the petition, the briefs and oral arguments, and all other matters of record, we conclude that no error was committed by the lower court, and accordingly, affirm the lower court's decision.

The facts of this case reveal that on February 16, 1985, at approximately 1:15 a.m., the appellant was working as a dryer-hopper operator, a position that he had held for about a year, when he was severely injured. The injury occurred when his left hand and arm were pulled into and crushed in the pinch-point of a self-cleaning conveyor tail pulley. The appellant testified that this accident happened as he was cleaning up ore spillage around the tail pulley so that it would not back up on the conveyor belt. The appellant indicated that clean-up of the spilled ore occurred three to four times a shift.

The appellant's testimony further indicated that "I went down and opened the gate.... I was up here shoveling materials on to the belt and while I saw [sic] shoveling, my coveralls must have got caught in the tail pulley and pulled me in." The appellant testified that he was instructed by William Dugger, the owner of Beckley Magnetite, to keep the conveyor systems running when cleaning up the spillage. The appellant also testified that he had not received any safety instruction regarding the operation of the machinery and that he only had been shown how to operate the dryer-hopper on one occasion before he started running it.

The appellant also offered the testimony of Dr. Wayne J. Wasson, the Federal Mine Safety and Health inspector who investigated the accident just after it occurred. Dr. Wasson testified that approximately one year prior to the accident, on February 21, 1984, he had issued a citation to Beckley Magnetite, for "the lack of a guard or a self-cleaning tail pulley on a conveyor." He testified that by guard he meant "a device to prevent persons from contacting moving machinery, getting caught up in or caught by or somehow [coming into] contact with moving machinery." Additionally, Dr. Wasson's testimony indicated that if in order to clean up the ore spillage, the person had to go into the guarded area, then there was a federal regulation that required the operation to be "turned off and locked out.... That's throwing the main disconnect and assuring that the power was off and applying a pad lock to the disconnect handle in such a manner that the power cannot be turned back on." Dr.

Wasson's testimony further revealed that the appellee immediately installed the requisite guard. He further testified that the guard installed by the appellee met the safety standards set by the Mine Enforcement Safety Administration (hereinafter referred to as MSHA) and accordingly, the MSHA inspector terminated and abated the citation previously issued.

Finally, Dr. Wasson testified that he investigated the appellant's accident and determined that the cause of the accident was "the injured [worker] working on or near the unguarded tail pulley without first shutting the conveyor down." He also testified that it was the responsibility of the appellant at the time he went into the guarded area to clean up the ore spillage to first turn off the power and lock out the machinery. While his testimony indicated that at the time of the appellant's injury he did issue a citation to the appellee, it also indicated that the citation was abated approximately fifteen minutes after it was issued when employees were reinstructed never to remove guards from around machinery or to enter a guarded area while the machinery was in operation.

The appellant also presented the testimony of Jimmy Ray Lilly, Charles Lilly, Leslie Lilly and Brady Allen Lilly, all former employees of appellee and all relatives of one another. Jimmy Ray Lilly had worked at Beckley Magnetite for approximately two weeks running the dryer-hopper. His employment occurred prior to the guard being placed around the machinery. Charles Lilly was hired primarily as a truck driver, but also occasionally worked on the dryer-hopper and unloaded material from the railroad cars. Leslie Lilly had driven trucks and worked on the dryer-hopper also at a time prior to the guard being installed. Finally, Brady Allen Lilly worked for the appellee running the dryer-hopper for only twenty-seven days. His employment ended shortly after the guard was installed. All of these witnesses testified that they were never instructed by the appellee to turn off the conveyor belt prior to shoveling ore spillage back onto the belt. However, none of them testified that they had ever been affirmatively instructed *not* to turn it off.

Nor did any of them testify that they ever made the employer aware of the practice of not turning off the belt.

The appellant also offered the testimony of Dr. Russell Rex Haynes, president and chief engineer of Tech Engineering and Design Incorporated, a forensic consulting engineering firm. It is important to note that most of his testimony concerning the Code of Federal Regulations which had allegedly been violated was premised upon his opinion that the fence which had been erected by the appellee was not a guard. Consequently, he opined that the dryer-hopper on which the appellant was injured was unguarded on the day of the injury. Dr. Haynes also testified that the difference between a fence and a guard was that "a guard is more closely attached to the problem ... [and] is so arranged and sufficient in scope that a person can't even get in behind it accidentally." Haynes testified based upon this opinion that the appellee was operating in violation of the following provisions found in the Code of Federal Regulations: (1) 30 C.F.R. § 55.9–7 which is a mandatory provision providing that "[u]nguarded conveyors with walkways shall be equipped with emergency stop devices or cords along their full length;" (2) 30 C.F.R. § 55.14–1 which is a mandatory provision providing that "[g]uards, sprockets, chains, drive head, tail and take up pulleys, fly wheels, couplings, shafts, saw blades, fan inserts and similar exposed moving machine parts which may be contacted by persons and which may cause injury to persons shall be guarded;" (3) 30 C.F.R. § 55.14–3 which mandates that "[g]uards at conveyor drive, conveyor head and conveyor tail pulleys, shall extend a distance sufficient to prevent a person from accidentally reaching behind the guard and becoming caught between the belt and the pulley;" (4) 30 C.F.R. § 55.14–7 which mandates that "[g]uards shall be of substantial construction and properly maintained;" and (5) 30 C.F.R. § 55.14–29 which states that "[r]epairs or maintenance shall not be performed on machinery until the power is off and the machinery is blocked against motion, except where ma-

chinery motion is necessary to make adjustments."

In addition, Dr. Haynes testified that even though the machinery was fenced in, it constituted "a very hazardous working condition if you were to enter the fence with the belt running ... " Finally, Haynes testified that a violation of both state and federal statutes, along with a violation of a commonly accepted business safety standard, occurred if "Mr. Blevins were told to go inside the fence while the belts or belt was operating in order to perform a task or clean up...."

The appellee's case consisted of three witnesses including William Dugger, Lloyd Stover and Okey Blevins. First, Lloyd Stover's testimony indicated that he was responsible for the safety training of employees at Beckley Magnetite. Stover's records regarding safety training reflected that he had met and discussed "[h]azard recognition, electrical hazard, [and] prevention of accidents" with the appellant on November 11, 1984, and again on December 28, 1984.[1] Stover testified that he instructed the appellant that if he had to go into the guarded conveyor area, he was to shut the conveyor belt down first. He also testified that while he knew the conveyor system was to be turned off prior to someone entering the guarded area, he did not know that the system had to be locked out also.

Next, William Dugger testified that since the installation of the conveyor and tail pulley involved in the accident in 1978, there had been no injuries involving that machinery until the appellant's. Dugger also testified on cross-examination in response to the appellant's question of whether he ever ordered the appellant to go inside that gate and clean up ore spillage without turning off the power first that "[m]y memory says I did not."[2]

The last witness' testimony offered by the appellee was that of Okey Blevins, who was working as foreman the night the appellant was injured. His testimony revealed that he only worked on the dryer-hopper when something broke down, and that his main job was to run the plant. Further, he could not remember whether there was a guard around the dryer-hopper the night of the appellant's accident, but he did indicate that he had received safety instruction and part of that instruction was "[w]hen you're working on the dryer system up there, you take and go down in the mill room down there and turn the main breaker off down there. At that time we had a bolt that went through there that holds the main breaker down." Finally his testimony revealed that while this was the proper procedure, he had witnessed employees shoveling ore spillage back onto the belt while the belt was operating. The witness was not asked by either side what action, if any, he took to halt the practice.

Additional evidence presented by the appellee through cross-examination of the appellant's witnesses revealed that the appellant was apparently the only person who testified that he was *affirmatively* instructed by the management to clean up the ore spillage while the conveyor belt was still running. The other witnesses for the appellant testified only that they were never instructed by the appellee to turn off the conveyor belt while cleaning up spillage. Moreover, none of the appellant's former employee witnesses was actually working at Beckley Magnetite at the time the accident occurred, and none of them had worked for the appellee since before the guard was installed with the exception of Brady Allen Lilly, who worked there for only about two days after the guard was installed. Finally, there was absolutely no evidence presented by the appellant, that on the night of the accident he was ordered, directed or even had it suggested to him that he was to go inside the gate and

---

1. The appellant testified that he began work at Beckley Magnetite in March 1983.

2. Dugger did testify that it was his understanding of the law that "a *guarded* conveyor can be cleaned up while in operation...." (emphasis added) His testimony indicated that "in

[the] case of our No. 1 belt that, that's inclined at the working level we were cited for not having a handrail. We installed a handrail on it and it's permissible today to shovel under that belt over the handrail onto the belt while it's in operation."

clean up the ore spillage while the machine was in operation. The appellant's testimony only indicated that when he first started working there he was instructed to keep the dryer-hopper going at all times and that Mr. Dugger reminded him of this every so often.

At the close of presentation of all the evidence in the case, the appellee renewed a motion for directed verdict previously made after the plaintiff finished its case-in-chief. The court took the motion under advisement, deciding to let the case go to the jury and treat the motion as one to set aside the verdict if one was returned in favor of the plaintiff. The jury found for the plaintiff-appellant, assessing damages at $150,000.00. Subsequent to that verdict, the court granted the appellee's motion for judgment notwithstanding the verdict.

The statutory framework surrounding a *Mandolidis*[3]-type action essentially provides for two separate and distinct methods of proving 'deliberate intention.' *See* Syl. Pt. 1, *Mayles v. Shoney's, Inc.*, 185 W.Va. 88, 405 S.E.2d 15 (1990). First, West Virginia Code § 23–4–2(c)(2)(i) (1983, 1991) provides that

(2) The immunity from suit provided under this section and under section six-a [§ 23–2–6a], article two of this chapter, may be lost only if the employer or person against whom liability is asserted acted with 'deliberate intention.' This requirement may be satisfied only if:

(i) [i]t is proved that such employer or person against whom liability is asserted acted with a consciously, subjectively and deliberately formed intention to produce the specific result of injury or death to an employee. This standard requires a showing of an actual, specific intent and may not be satisfied by allegation or proof of (A) conduct which produces a result that was not specifically intended; (B) conduct which constitutes negligence, no matter how gross or aggravated; or (C) willful, wanton or reckless misconduct; ....

It is apparent through the five special interrogatories submitted to the jury, that in the present case the appellant attempted to prove deliberate intention by utilizing the second method of proof by offering evidence of the five specific requirements found in W.Va.Code § 23–4–2(c)(2)(ii) (1983, 1991). This statutory provision states that a plaintiff proves deliberate intention where

(ii) The trier of fact determines, either through specific findings of fact made by the court in a trial without a jury, or through special interrogatories to the jury in a jury trial, that all of the following facts are proven:

(A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

(B) That the employer had a subjective realization and an appreciation of the existence of such specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by such specific unsafe working condition;

(C) That such specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of such employer, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions;

(D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C) hereof, such employer nevertheless thereafter exposed an employee to such specific unsafe working condition intentionally; and

(E) That such employee so exposed suffered serious injury or death as a direct and proximate result of such specific unsafe working condition.

---

**3.** *See Mandolidis v. Elkins Indus., Inc.,* 161 W.Va. 695, 246 S.E.2d 907 (1978).

## I.

■ The appellant's first assignment of error concerns whether the trial court erred in determining that a specific unsafe working condition did not exist in the workplace which presented a high degree of risk and strong probability of serious injury or death. *See* W.Va.Code § 23–4–2(c)(2)(ii)(A). The appellant contends that the trial court disregarded overwhelming evidence in reaching the following conclusion:

A. A specific unsafe working condition existed in the workplace at dryer-conveyor tail pulley assembly,[4] which, because of the lack of a history or record of injury because of such condition, did not bring to the employer's attention an appreciation of its potential high degree of risk and a strong probability of serious injury.

The appellant argues that the unsafe working condition which existed in the workplace was the appellant working in and around an unguarded tail pulley and corresponding pinch points on an operating conveyor belt assembly. The overwhelming evidence establishing this condition, according to the appellant, includes the citation issued by MSHA one year prior to the accident which, the appellant alleges, put the appellee on notice of the danger of serious injury created by not having a guard around the pinch points of the conveyor belt system while it was in operation. Further, the appellant maintains that the appellee had actual knowledge of the unsafe working condition and the high degree of risk of serious injury based upon the testimony of William Dugger, who recognized that working around the tail pulley area of the conveyor systems was dangerous.

The appellee, however, maintains that originally, the unsafe working condition was the unguarded tail pulley portion of the conveyor belt system. This unsafe working condition was rectified, to MSHA's satisfaction, by the erection of a fence. Moreover, the later citation which was issued concerning appellant's accident was not for an unguarded tail pulley, but rather only required Beckley Magnetite to reinstruct and recaution employees not to remove guards or enter a guarded area while machinery was in operation. A specific unsafe working condition, therefore, only existed when the appellant went into the guarded area, without first turning off the equipment, to clean up the ore spillage, failing to comply with safety procedures. Furthermore, the MSHA inspector's testimony that the cause of the appellant's injury was his working on or near the unguarded tail pulley without first shutting off the conveyor, and his further testimony that it was the appellant's duty to turn off the conveyor, demonstrated that the appellant failed to show a specific unsafe working condition existed, other than the one the appellant created by removing the guard, which presented a high degree of risk or strong probability of serious injury to employees.

In *Mayles*, the injured worker satisfied the requirement of proving a specific unsafe working condition presenting a high degree of risk and a strong probability of harm or serious injury by offering evidence which showed that hot grease was disposed of by carrying it in an open container down a grassy slope in order to discard the material in fifty-five-gallon drums. 185 W.Va. at 94, 405 S.E.2d at 21. The plaintiff in the *Mayles* case was injured when he slipped and fell on the grassy slope while disposing of the hot grease and was severely burned when the grease splashed out of the container and fell onto him. *Id.* 185 W.Va. at 89, at 16.

In the present case, however, the trial court properly concluded that the plaintiff failed to prove the existence of a specific unsafe working condition which presented a high degree of risk and the strong probability of injury or death to employees. The evidence demonstrates that the tail pulley portion of the conveyor belt system was guarded in a way which was accepted and approved by the MHSA inspector. Further, the evidence indicated that it only became unsafe when the guard was re-

**4.** The lower court indicated that this specific unsafe working condition was "the cleaning of spillage around the dryer conveyor tail pulley while the conveyor was operating."

moved and a worker entered the unguarded area while the machinery was in operation. By the appellant's own evidence, it was the responsibility of the dryer-hopper operator to turn the machinery off while cleaning ore spillage.

## II.

■ The appellant's next assignment of error concerns whether the circuit court erred in finding that the appellee did not have subjective realization and appreciation of the existence of an unsafe working condition and that it presented a high risk and strong probability of serious injury. *See* W.Va.Code § 23–4–2(c)(2)(ii)(B). The lower court found that:

B. Because of the erection of the guard fence by the employer and its approval by the MSHA authority; and because no previous injury had occurred in the same workplace under the same circumstances as that of the plaintiff; the court does not find under such circumstances that the employere [sic] had a subjective realization and an appreciation of the existence of the dryer-conveyor tail pulley assembly as a specific unsafe working condition and that the same presented a high degree of risk and a strong probability of serious injury or death to an employee.

The appellant argues that the erection and existence of the fence guard is of no consequence, since one of the appellee's witnesses, Okey Blevins, testified that he had observed employees entering the fence guard and shoveling ore spillage while the belt was running. Consequently, the appellant further contends the actual observation of this practice constituted knowledge sufficient to show the employer had a subjective realization and appreciation of the danger involved. Finally, the appellee points out that the appellant was instructed to shut down the conveyor before going into the guarded area and moreover, the appellee never instructed the appellant to deviate from those safety instructions.

We considered the type of evidence required to prove the subjective realization and appreciation by the employer of the existence of an unsafe working condition and the high degree of risk and strong probability of serious injury presented to an employee by such condition in *Mayles*, 185 W.Va. at 94, 405 S.E.2d at 21–22. In *Mayles*, not only was it clearly established that it was the general practice of employees to take the hot grease out the back door and down the grassy slope without a lid, but it was also established that the employer encouraged a " 'do everything right now' " policy that mandated such unsafe practice. *Id.* 185 W.Va. at 94, 405 S.E.2d at 21. A former manager even testified that it was the restaurant's policy to dump the grease while it was hot. *Id.* 185 W.Va. at 90, 405 S.E.2d at 17. Further, the manager at the time the accident occurred testified that he had heard " 'rumors' " that the hot oil was being disposed of before it was cooled and while he had made plans to change that practice, no such action had been taken prior to the accident. *Id.* 185 W.Va. at 94, 405 S.E.2d at 21. Also, other employees had gone to management and complained that the manner in which the hot grease was disposed was unsafe. Finally, another employee, who was also a former manager, had been injured in the same manner a few months prior to the accident involving Mayles. *Id.* 185 W.Va. at 95, 405 S.E.2d at 22.

In contrast, the evidence in the instant case reflects that there had been no prior injuries on the dryer-hopper which would have given the appellee a subjective realization and appreciation of the unsafe working condition. Further, there was evidence the employer had instructed the employees to turn the dryer-hopper off before entering the guarded area to clean up spillage. Even the appellant's own expert testified it would be the worker's responsibility to do so. There was no evidence that any employee brought to the employer's attention any information to put the employer on notice that an unsafe working condition or a high degree of risk to employees existed. While the appellant relies upon the issuance of a citation regarding the unguarded conveyor, the appellee points out that the citation was terminated and abated by the erection of the fence, which was accepted by the MSHA inspector. Accordingly, it is clear that the jury was not presented with sufficient evidence to establish the

type of proof necessary to show that the employer had a subjective realization and appreciation of the existence of an unsafe working condition.

Even in *Mayles*, where the plaintiff's evidence was very strong, we indicated it would probably not have fallen within the parameters of "the extremely narrow concept of deliberate intent enunciated in *Mandolidis*." *See Mayles*, 185 W.Va. at 96, 405 S.E.2d at 23 (citing *Mandolidis*, 161 W.Va. at 695, 246 S.E.2d at 907). However, the Legislature liberalized the concept first enunciated by this Court in *Mandolidis* by enacting the statute which provided the alternative means of proving deliberate intention through the five requirements found in W.Va.Code § 23–4–2(c)(2)(ii).

■ It is clear however, that given the statutory framework of W.Va.Code §§ 23–4–2(c)(2)(i) and (ii) which equates proof of the five requirements listed in W.Va.Code § 23–4–2(c)(2)(ii) with deliberate intention, a plaintiff attempting to impose liability on the employer must present sufficient evidence, especially with regard to the requirement that the employer had a subjective realization and an appreciation of the existence of such specific unsafe working condition and the strong probability of serious injury or death presented by such specific unsafe working condition. This requirement is not satisfied merely by evidence that the employer reasonably should have known of the specific unsafe working condition and of the strong possibility of serious injury or death presented by that condition. Instead, it must be shown that the employer actually possessed such knowledge. The evidence in the instant case was tenuous at best.

Consequently, we must conclude that the trial court was correct in granting the appellee's motion notwithstanding the verdict based upon West Virginia Code § 23–4–2(c)(2)(iii)(B) which specifically provides for such a determination by the trial court in the following pertinent provision:

(B) Notwithstanding any other provision of law or rule to the contrary, and

consistent with the legislative findings of intent to promote prompt judicial resolution of issues of immunity from litigation under this chapter, the court shall dismiss the action upon motion for summary judgment if it shall find, pursuant to Rule 56 of the Rules of Civil Procedure that one or more of the facts required to be proved by the provisions of subparagraphs (A) through (E) of the preceding paragraph (ii) do not exist, and the court shall dismiss the action upon a timely motion for a directed verdict against the plaintiff if after considering all the evidence and every inference legitimately and reasonably raised thereby most favorably to the plaintiff, the court shall determine that there is not sufficient evidence to find each and every one of the facts required to be proven by the provisions of subparagraph (A) through (E) of the preceding paragraph (ii).[5]

In upholding the trial court's decision to grant the appellee's motion, it is important to remember that the ultimate goal of W.Va.Code § 23–4–2(c)(2)(ii) is to offer an alternative method of proof for a plaintiff to establish that his injury was *deliberately intended* by the employer. *See* Syl.Pt. 2, *Mayles*, 185 W.Va. at 88, 405 S.E.2d at 15 (emphasis added). Thus, when a plaintiff utilizes the five requirements found in West Virginia Code § 23–4–2(c)(2)(ii), his evidence must be strong enough that it essentially equates to a showing that "the employer … against whom liability is asserted acted with 'deliberate intention.'" *Id.* § 23–4–2(c)(2). In the present case, the evidence offered to demonstrate the existence of deliberate intention on the part of the employer was weak at best.

### III.

■ The last assignment of error raised by the appellant is that the circuit court erred in its application of the statute and its concomitant conclusion that the employer did not act with a consciously, subjectively and deliberately formed intention to injure the appellant. The appellant argues

---

**5.** For a discussion of the procedural standards in deciding motions for summary judgment, directed verdict and judgment notwithstanding

the verdict under this statute, *see Sias v. W–P Coal Co.*, 185 W.Va. 569, 408 S.E.2d 321 (1991).

that the circuit court applies the incorrect statutory requirement to the evidence introduced at trial in making this determination.

As previously held by this Court in syllabus point 1 of *Mayles* "[t]he statute creating a legislative standard for loss of employer immunity from civil liability for work-related injury to employees found in W.Va.Code § 23–4–2 (1983) essentially sets forth two separate and distinct methods of proving 'deliberate intention'." 185 W.Va. at 88, 405 S.E.2d at 15. Additionally, we held that "[a] plaintiff may establish 'deliberate intention' in a civil action against an employer for a work-related injury by offering evidence to prove the five specific requirements provided in W.Va.Code § 23–4–2(c)(2)(ii)." *Mayles,* 185 W.Va. at 96, 405 S.E.2d at 23 and Syl.Pt. 2.

While the lower court does state that "[t]he court, under the foregoing circumstances, and irrespective of the correctness of its Ruling A, B and C[6], supra, does not find that the employer, upon the totality of all of the evidence, acted with consciously, subjectively and deliberately formed intention to produce the specific result of injury to the plaintiff," it is apparent from our review of the record that the lower court did correctly evaluate each requirement listed in West Virginia Code § 23–4–2(c)(2)(ii). The lower court merely went one step further and also evaluated the case under the alternative method of proof of deliberate intention found in W.Va.Code § 23–4–2(c)(2)(i). Just because the lower court evaluated the case under both methods of proof of the deliberate intention requirement offered by the statute does not create error in the lower court's decision.

Based upon the foregoing opinion, we accordingly affirm the decision of the Circuit Court of Raleigh County.

Affirmed.

---

**6.** The lower court's rulings A and B are found *supra* in the text of this opinion. Ruling C made by the lower court was that "[t]he court does find that the injury to the plaintiff oc-

curred because of his failure to turn off the dryer-conveyer before cleaning up the spillage around the tail pulley which was a violation of the cited MSHA safety regulations."