575 S.E.2d 158

James TOLLEY and Nancy Tolley, his wife, Plaintiffs Below, Appellants,

v.

ACF INDUSTRIES, INC., a New Jersey corporation; Ashland Oil, Inc., a Kentucky corporation, using the trade name Ashland Chemical; Bayer Corporation, an Indiana corporation; Carboline Company, a Delaware corporation; Columbia Paintings Corporation, a West Virginia corporation; E.I. DuPont de Nemours & Company, a Delaware corporation; Essex Specialty Products, Inc., a foreign corporation; Exxon Corporation, a New Jersey corporation, using the trade name, Exxon Company; Fina Oil and Chemical Company, a Delaware corporation; the Glidden Company, a foreign corporation; RPM Mameco International, a foreign corporation; Sherwin–Williams Company, an Ohio corporation; Defendants Below, Appellees.

No. 30461.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 9, 2002.

Decided Nov. 14, 2002.

Dissenting Opinion of Justice McGraw Jan. 3, 2003.

Stuart Calwell, John Skaggs, Vincent Trivelli, The Law Offices of Stuart Calwell, PLLC, Charleston, for the Appellants.

Thomas E. Scarr, Michael A. Frye, Jenkins Fenstermaker, PLLC, Huntington, for the Appellee, ACF Industries, Inc.

John R. McGhee, Jr., Kay, Casto & Chaney, PLLC, Charleston, for the Appellee, Carboline Company.

Marc E. Williams, Rodney L. Baker, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, for the Appellee, Fina Oil and Chemical Company.

PER CURIAM.

Appellants, James and Nancy Tolley, appeal from the July 27, 2001, order of the Circuit Court of Kanawha County granting summary judgment to Appellee ACF Industries, Inc. ("ACF") in connection with their "deliberate intention" statutory cause of action.[1] In the underlying cause of action, Appellants alleged that, as a result of his employment in the paint department of ACF, Mr. Tolley sustained certain breathing ailments, including aggravation of preexisting asthma and hypersensitivity pneumonitis. Appellants seek a reversal of the lower court's ruling, arguing that they demonstrated genuine issues of fact sufficient to defeat the summary judgment motion. Upon our review of the arguments raised in conjunction with the record submitted in this case, we find no error and, accordingly, affirm.

## I. Factual and Procedural Background

During the period of 1988 through December 1995, Mr. Tolley worked in the ACF paint shop.[2] Beginning in 1992, Mr. Tolley was a foreman in the "prime booth," which is the area where a prime coat of paint is applied to the railroad cars manufactured by ACF. His duties as a foreman required him to supervise workers engaged in applying paint to the rail cars, to measure the thickness of the paint on those cars,[3] to inspect workmanship on rail cars, and provide safety

1. *See* W.Va.Code § 23–4–2(c)(2)(ii) (1994) (Repl. Vol.2002).

2. Although Mr. Tolley worked for ACF for twenty-eight years, the focus of the "deliberate intention" lawsuit involves a three-year period of his employment in the ACF paint shop—from 1992 to 1995.

3. This is referred to as "milling."

training about hazard communications and respiratory protection.

After December 1, 1995, Mr. Tolley was unable to work due to acute prostatitis. While off work due to that condition, he sought treatment for certain breathing difficulties on April 1, 1996, and was diagnosed as having allergic asthma. Mr. Tolley returned to work on April 22 and 23, 1996, but those were his last two days of employment at ACF.[4]

On May 6, 1996, Mr. Tolley's treating physician diagnosed him as unable to work due to asthma and hypotension, but noted that this medical disability did not arise from his employment. After being diagnosed with severe obstructive disease and asthma in July 1996, Mr. Tolley filed a workers' compensation claim upon Dr. Ranavya's finding that he was permanently and totally disabled as a result of occupational lung disease. Dr. Zaldivar, the physician who evaluated Mr. Tolley at the request of the Workers' Compensation Fund, concluded that, although Mr. Tolley stated he had hypersensitivity pneumonitis, his condition appeared to be asthma unrelated to occupation.[5] Notwithstanding Dr. Zaldivar's conclusion, Mr. Tolley's workers' compensation claim was ruled compensable.

On March 17, 1997, Appellants filed a cause of action against ACF and various other corporate entities that allegedly manufactured paint products used at ACF during the relevant period [6] of Mr. Tolley's employment at ACF.[7] Appellants alleged injury against ACF on grounds of "deliberate intention," products liability, and negligence. By order entered on December 1, 1998, the circuit court dismissed with prejudice the negligence and products liability claims asserted by Appellants against ACF, finding that workers' compensation benefits and a civil action for excess damages allegedly caused by the "deliberate intention" of the employer are "the sole and exclusive remedies available to an injured employee who alleges that his injury occurred in the work place." [8]

On January 27, 2000, ACF filed a motion for summary judgment. Following hearings on March 20 and 29, 2000, the circuit court issued its decision on July 27, 2001, granting summary judgment to ACF. Through this appeal, Appellants seek a ruling reversing that decision and permitting them to proceed to trial against ACF.

## II. Standard of Review

■■ The applicable standard which governs our scrutiny is axiomatic: "A circuit court's entry of summary judgment is reviewed *de novo.*" Syl. Pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). Similarly well-ensconced in the law is the principle that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co.,* 148 W.Va. 160, 133 S.E.2d 770 (1963). Against these principles, we examine this case to determine whether the grant of summary judgment was proper.

4. During that two-day period, Mr. Tolley worked in the steel shop and not the paint shop.

5. According to his medical history, Mr. Tolley had a history of childhood asthma and suffered seasonal allergy symptoms throughout his life. He also smoked two packs of cigarettes a day for approximately 19 years.

6. Appellants assert that the relevant time period is from 1992 to 1995 when Mr. Tolley worked in the paint department.

7. After the granting of ACF's motion for summary judgment, the remaining defendants in the underlying case are Carboline Company, E.I. DuPont de Nemours & Company, and Fina Oil and Chemical Company. Liability against each of these defendants is premised on theories of products liability.

8. The circuit court also rejected Appellants' attempt to rely on the "dual capacity" or "dual personna" doctrine as a method of circumventing ACF's statutory immunity from common law suit. *See* W.Va.Code §§ 23–2–6 (1991) (Repl.Vol. 2002), 23–4–2 (1994) (Repl.Vol.2002). We find no basis for error with regard to the lower court's finding that West Virginia "has never adopted and applied the ["dual capacity" or "dual persona"] doctrine to circumvent an employer's statutory immunity from common law suit provided by ... West Virginia Code § 23–2–6 and West Virginia Code § 23–4–2, and the Court finds that the doctrine should not be applied in this case."

## III. Discussion

■ In syllabus point two of *Mayles v. Shoney's, Inc.*, 185 W.Va. 88, 405 S.E.2d 15 (1990), we recognized that: "A plaintiff may establish 'deliberate intention' in a civil action against an employer for a work-related injury by offering evidence to prove the five specific requirements provided in W.Va.Code § 23–4–2(c)(2)(ii) (1983)." Those five statutory requirements that must each be established to demonstrate this particular cause of action are:

(A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

(B) That the employer had a subjective realization and an appreciation of the existence of such specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by such specific unsafe working condition;

(C) That such specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of such employer, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions;

(D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C) hereof, such employer nevertheless thereafter exposed an employee to such specific unsafe working condition intentionally; and

(E) That such employee so exposed suffered serious injury or death as a direct and proximate result of such specific unsafe working condition.

W.Va.Code § 23–4–2(c)(2)(ii).

In its lengthy judgment order, the circuit court separately addressed these five statutory factors and concluded, in each instance, that Appellants had failed to establish the requisite element. Appellants argue that the decision of ACF not to monitor for the presence of a specific type of chemical—isocyanates—is the underlying reason for the lower court's conclusion that they cannot meet the statutory factors. In response to the circuit court's finding that Appellants failed to demonstrate that the ACF plant had excessive levels of isocyanates,[9] which in turn caused an unsafe working condition, and further failed to produce evidence that Mr. Tolley was ever exposed to isocyanates during his employment in the ACF paint department, Appellants contend that they only have to demonstrate the opportunity for exposure and not actual levels of exposure. We proceed to examine each of the five factors required to demonstrate a "deliberate intention" action under West Virginia Code § 23–4–2(c)(ii) to determine whether Appellants raised genuine issues of material fact as to each of the five elements—a necessary prerequisite to jury consideration of this type of case.

### A. Unsafe Working Condition

The initial hurdle that must be demonstrated is an unsafe working condition that presented a high degree of risk and a strong probability of serious injury or death. *See* W.Va.Code § 23–4–2(c)(ii)(A). Disputing the circuit court's ruling that they provided no evidence to support their allegation regarding an unsafe working condition, Appellants cite the existence of material safety data sheets ("safety data sheets") used by ACF on its paint products, which contain warnings with regard to the health and safety hazards of those products. From these safety data sheets, Appellants argue that they have demonstrated: (1) high levels of precautions should have been taken when using these paint products; and (2) these products can be respiratory irritants. Appellants reason that ACF's decision not to specifically monitor for the presence of isocyanates in light of the known respiratory hazards associated with such chemicals requires the conclusion

---

**9.** The specific isocyanate at issue is hexamethylene diisocyanate "(HDI)". HDI is a chemical component of a polyurethane exterior top coat finish.

that Mr. Tolley was necessarily exposed to an unsafe working condition.

With no specific references to actual evidence submitted, Appellants state simply "[i]t is clear that ACF violated these Material Safety Data Sheets." In similar conclusory fashion, Appellants assert that "ACF's actions violated fundamentals of basic industry standards regarding industrial hygiene and safety."

As to the decision not to monitor specifically for isocyanates, the circuit court found the following:

1. Plaintiffs have presented no evidence that plaintiff James Tolley was actually exposed to isocyanates or phthalic anhydrides [10] either in the Exterior Finish Booth, or in the Exterior Prime Booth, or in open areas within the Paint Department. At most, the plaintiffs can establish that plaintiff had the "potential" or "opportunity" for such exposure.

2. No facts or evidence have been produced to support plaintiffs' general allegation that plaintiff James Tolley was exposed to hazardous levels of isocyanates or phthalic anhydrides while working at ACF's Paint Department. While plaintiff generally testifies that he believes he was exposed to the chemicals at issue in this case and that he was exposed to hazardous levels, plaintiff's causation and liability experts indicate that the extent of their opinions is that there was a "potential" or "opportunity" for exposure.

3. While there is evidence that ACF was aware that exposure to certain hazardous chemicals could cause respiratory problems, the evidence indicates that as a result of that awareness, ACF took various precautionary remedial measures to eliminate this potential hazard. . . .

4. Plaintiffs allege that ACF should have tested directly for the chemicals at issue in this case, i.e. isocyanates and phthalic anhydrides, rather than relying on solvent testing to estimate the amount and levels of these chemicals, and failure to do so violates 29 CFR 1910.134. However, as plaintiffs' experts acknowledge, 29 CFR 1910.134 does not expressly require an employer to monitor specifically for these chemicals; plaintiffs' experts simply infer such a requirement.

5. Levels of isocyanates were not specifically measured because ACF determined that based on its knowledge and information concerning the nature and chemical characteristics and amount of the isocyanates used, and certain inherent testing problems effecting the accuracy of such monitoring,[11] specific testing for isocyanates was not necessary or practical.

6. Based on the specific testing performed for solvents and other chemicals, and based on its institutional knowledge concerning the known concentration of the isocyanates in the coatings, their chemical characteristics, ventilation and other engineering controls in place, ACF concluded that the isocyanates were below safe and permissible exposure levels and/or threshold limit values, and therefore there was no meaningful opportunity for overexposure to isocyanates.

7. While plaintiffs' experts assert that ACF's primary failing was in using solvent levels as a basis to estimate the levels and concentrations of other chemicals in the Paint Department, in essence disagreeing with ACF's exercise of professional judgment, they readily agree that using professional judgment is common and an expected industrial hygiene practice.

---

10. While phthalic anhydrides was one of the chemicals that plaintiffs alleged Mr. Tolley was exposed to at ACF, the lower court found that "[t]here is absolutely no actual evidence in this case that any products used in ACF's Paint Department during the relevant time period contained phthalic anhydrides."

11. According to ACF, isocyanate testing was attempted at its Bude, Mississippi, facility in 1988. Certain mechanical problems were encountered with its attempt to measure the presence of isocyanates with an impinger, which is a solution containing piperazine that absorbs isocyanate vapors. These problems included both analytical problems concerning speciation of the different types of isocyanates, as well as mechanical difficulties due to employee movement.

In its conclusions of law, the trial court further addressed this issue of ACF's decision not to monitor for isocyanates:

The undisputed evidence indicates that ACF made a judgment that using solvent testing to estimate levels and concentrations of other chemicals was appropriate, and that based on available information, it had eliminated the potential for excessive exposure to the chemicals at issue in this case. While plaintiffs' experts disagree with the manner in which ACF performed its evaluation, plaintiffs' experts admit that good, well intentioned and well qualified individuals can disagree about the manner of performing industrial hygiene. Plaintiffs' experts essentially conclude that ACF "should have" used a different method of testing for the chemicals at issue in this case. However, what a person "should have" done is a negligence question and is insufficient to satisfy the deliberate intent standard applicable in this case.

Appellants seek to have this Court, with no evidence of actual exposure to isocyanates,[12] conclude that an unsafe working condition can be determined to exist merely based on the possibility of exposure to a harmful chemical. While the case may one day present itself of a chemical so noxious that non-monitoring is in itself sufficient to constitute an unsafe working condition, this is not such a case. The nature of the particular chemical involved here and its specific use at ACF has been demonstrated by the Appellee to have a very limited temporal period for potential exposure.[13] This is because the isocyanate at issue—HDI—polymerizes quickly and once the hardening occurs, there is little toxic effect, if any.[14] This fact, combined with the fact that Mr. Tolley did not work in the part of the plant where products containing isocyanates were applied,[15] strongly sug-

12. Appellants cite *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir.1999), as support for their contention that they do not need to prove specific levels of exposure. In *Westberry*, the court of appeals ruled that, with regard to whether a physician could testify about causation concerning whether exposure to talc could produce a sinus irritation, the absence of specific levels of talc exposure was not necessary as "there was evidence of a substantial exposure." *Id.* at 264. While that decision does support the notion that a particularized level of exposure is not necessary before an expert opinion may be offered on causation, it does not stand for the general proposition that Appellants suggest: that a plaintiff can succeed on a "deliberate intention" cause of action with absolutely no evidence whatsoever of exposure levels, especially where the exposure involved is a chemical that is not detectable by sight or smell.

While we appreciate that fact that the lack of exposure evidence is attributable, in part, to ACF's decision not to monitor for isocyanates, Appellants did not avail themselves during the discovery phase of this case of the opportunity to conduct any air monitoring of the plant for isocyanate levels. ACF observes additionally that Appellants "never performed any modeling using information regarding work site ventilation" or "attempted in any way to estimate the amount of chemical to which [Mr.] Tolley was allegedly exposed."

13. The particular isocyanate at issue, HDI, is present in the hardener/activator/cure component of the polyurethane coating that is applied as an exterior finish.

14. With regard to the limited period of exposure possibility to HDI due to the polymerization process, the lower court found:

[P]olymerization, the process whereby isocyanate molecules chemically react and harden to form the final cured coating on the railroad car, begins immediately when the paint components are mixed, and within minutes the product is reasonably cured, further reducing exposure opportunity to individuals not actively involved in spraying operations. Once an isocyanate polymerizes, it loses its toxicity and has virtually no hazard potential. Furthermore, any isocyanate not reacting with other paint components reacts quickly with moisture in the air and converts to a polyurea, a substance which has little, if any, toxicity.

15. Although Appellants suggest a migration cause of exposure, the limited time period during which HDI is in a non-hardened state and thus most likely to be a respiratory irritant mitigates against such a theory. ACF rejects this notion of migration exposure, noting that the exterior finish booth where the HDI containing top coat was applied was equipped with curtains at the ends of the booth, waterfall systems to reduce overspray, and negative pressure ventilation systems. And, even assuming the escape of some level of isocyanates, ACF notes that such molecules would quickly polymerize and turn into polyureas, a non-hazardous chemical. The lower court found that "[s]ince the polymerization process begins to occur within minutes of exposure to the environment ... [polymerization] reasonably would have been expected to occur long before any isocyanate molecules would have 'migrated'

gests that his breathing ailments were not caused by isocyanate exposure. In addition, blood testing results indicated that Mr. Tolley had not been exposed to isocyanates.[16]

When the facts of this case are viewed in conjunction with the known properties of the chemical at issue, there is, undeniably, a paucity of evidence to support Appellants' claim of occupational asthma induced by isocyanate exposure.[17] Absent some evidence of exposure,[18] an unsafe working condition cannot be even argued to exist. Accordingly, we find no basis from which to find that the lower court erred in reaching its conclusion that Appellants failed to produce evidence of an unsafe working condition sufficient to satisfy the first prong of the five-part "deliberate intention" statutory cause of action. *See* W.Va.Code § 23–4–2(c)(2)(ii).

## B. Subjective Realization of Unsafe Working Condition

The primary ground upon which Appellants rely to argue that ACF had a subjective realization of the specific unsafe working condition—the presence of isocyanates—is the fact that four other ACF employees had compensable workers' compensation claims for breathing related problems during the relevant time period. ACF notes that not only were the number of workers' compensation claims for respiratory ailments associated with paint exposure exceedingly low,[19] none of the four individuals who had such complaints had similar job duties to Mr. Tolley. Rather than being a foreman with limited exposure to the paint application process, the complainants were painters and mixers who worked inside the paint booths for the majority of their work day. During the relevant time period, no foreman or other person performing Mr. Tolley's job duties ever made a respiratory claim.

ACF had no basis for knowing that Mr. Tolley was experiencing any breathing related difficulties due to the fact that he never complained of symptoms consistent with chemical sensitization[20] or suffered any episodes of spasmodic coughing or inability to breathe. Although there were multiple opportunities for Mr. Tolley to alert his employer to a respiratory problem, if one existed, the record demonstrates that not until 1996, approximately four months after he stopped working at ACF due to his unrelated prostatitis, is there any evidence of Mr. Tolley having a respiratory condition.[21]

---

any meaningful distance from the Exterior Finish Booth."

16. ACF argues that had Mr. Tolley been exposed to isocyanates, the blood studies, which were performed on him and proved negative, would be expected to show the presence of isocyanate antibodies.

17. The trial court, through its findings, recognized that "the factual, medical evidence in this case is inconsistent with the expected onset of respiratory difficulties caused by exposure at work to the chemicals at issue in this case" based on the fact that "plaintiff's own testimony and the medical records indicate that ... [his] symptoms became worse months after he left work in the Paint Department at ACF." The recognized period of response upon being exposed to an isocyanate is "either ... immediate ... or ... late ..., *i.e.* 6 to 8 hours after exposure." Rather than worsening, "[t]he general course for a person having occupational asthma is that when they are removed from the work place and exposure to the inciter, their condition improves or at least stays the same."

18. It is significant that Appellants' experts could not testify to more than the "possibility" or "opportunity for" exposure to isocyanates.

19. For the period of 1988 through 1995, only seven workers' compensation claims related to exposure to paint fumes were filed. Of those seven, only four were determined to be work-related. During this period of time, there were 354 employees working in the ACF paint department.

20. Clinical evidence indicates that hypersensitivity pneumonitis (allergic reaction following inhalation) "classically starts with fever, muscle ache and general malaise approximately 4 to 8 hours after exposure to an antigen. Symptoms typically reach a peak at 8 to 12 hours post-exposure and then improve over the next 12 to 24 hours." ACF argues that because Mr. Tolley had been off work almost four months when he was diagnosed with a breathing disorder, that his symptoms are inconsistent with chemical sensitization, which involves an immediate reaction upon exposure followed by quickly alleviated symptoms upon removal from the sensitizing agent.

21. For example, in completing a questionnaire in February 1992, Mr. Tolley denied having any respiratory problems. On July 19, 1993, during an office visit with Dr. Peterson, he denied shortness of breath. Mr. Tolley was administered an

■ This Court recently recognized in syllabus point two of *Nutter v. Owens–Illinois, Inc.*, 209 W.Va. 608, 550 S.E.2d 398 (2001), that "while a plaintiff may choose to introduce evidence of prior similar incidents or complaints to circumstantially establish that an employer has acted with deliberate intention, evidence of prior similar incidents or complaints is not mandated by *W.Va.Code*, 23–4–2(c)(2)(ii) [1994]." In contrast to the facts demonstrated in *Nutter* to circumstantially[22] indicate that the employer had the requisite subjective realization of a specific unsafe working condition,[23] this case does not contain even circumstantial evidence tending to suggest that ACF was aware of excessive levels of isocyanates.[24]

We made clear in *Blevins v. Beckley Magnetite, Inc.*, 185 W.Va. 633, 408 S.E.2d 385 (1991), that

> a plaintiff attempting to impose liability on the employer must present sufficient evidence, especially with regard to the requirement that the employer had a subjective realization and an appreciation of the existence of such specific unsafe working condition and the strong probability of serious injury or death presented by such specific unsafe working condition. This requirement is not satisfied merely by evidence that the employer reasonably should have known of the specific unsafe working condition and of the strong probability of serious injury or death presented by that condition. Instead, it must be shown that the employer actually possessed such knowledge.

■ The record in this case makes clear that Appellants have failed to produce the proof required to meet the subjective knowledge standard, either by direct or circumstantial evidence, of demonstrating that ACF was aware that it was exposing its employees to excessive levels of isocyanates. *See Nutter*, 209 W.Va. at 613, 550 S.E.2d at 403; *see also Sias v. W–P Coal Co.*, 185 W.Va. 569, 575, 408 S.E.2d 321, 327 (1991) (recognizing that "[s]ubjective realization, like any state of mind, must be shown usually by circumstantial evidence"). Accordingly, we find no error with regard to the lower court's conclusion that Appellants failed to introduce evidence that ACF had a subjective knowledge and appreciation of a specific unsafe working condition.

## C. Violation of State or Federal Safety Statute, Rule, or Regulation

To meet this prong of the "deliberate intention" cause of action, Appellants rely on generalized allegations of non-compliance with safety regulations pertaining to respiratory equipment; the warnings provided in the safety data sheets; and employee training on hazardous chemicals. While Appellants identify certain federal regulations that govern an employer's responsibility to have appropriate respiratory equipment (29 C.F.R. § 1910.134); to provide employee training on hazardous chemicals (29 C.F.R. § 1910.1200(h)(3)); and to develop and maintain a safety data sheet for hazardous chemicals (29 C.F.R. § 1910.1200(g)), they have not introduced specific evidence that ACF violated any of these regulations or that any of

exercise treadmill stress test on January 26, 1995, during which it was noted that he "was able to exercise vigorously and actually pushed himself to maximum heart rate without precipitating any clinical symptoms." During three doctor's visits (9/13/95; 10/5/95; 2/96), Mr. Tolley denied having any respiratory problems.

**22.** We observe that this Court's recognition of the need to rely upon circumstantial evidence to demonstrate the employer's state of mind with regard to subjective realization of a specific unsafe working condition did not in any way alter the elements necessary to prove a "deliberate intention" cause of action. Instead, the use of circumstantial evidence was noted in terms of permitting the jury to make certain inferences in reaching a decision on the issue of subjective

realization of the unsafe working condition at issue. *See* 209 W.Va. at 613, 550 S.E.2d at 403.

**23.** The alleged unsafe working condition involved exposure to high levels of carbon monoxide produced by forklifts and other machinery.

**24.** Appellants cite to one line of a June 1992 memorandum in which an ACF management employee, Mr. Baggett, indicates that testing for solvents "does not address all potential exposure problems or health hazards" as sufficient to raise an issue of fact regarding the subjective realization of a specific unsafe working condition. This statement, on its own, is not enough to suggest that ACF was aware that it was exposing its employees to excessive levels of isocyanates—the specific unsafe working condition at issue here.

these alleged violations specifically applied to the alleged unsafe working condition at issue. *See* W.Va.Code § 23–4–2(c)(ii)(C) (requiring that violated statute, rule, regulation, or standard is "specifically applicable to the particular work and working condition involved").

■ Instead, Appellants attempt to inferentially impose a regulation on ACF to monitor for isocyanates that does not exist. The trial court found that Appellants' "experts admit that the alleged requirement for testing for the chemicals at issue in this case is not actually in the regulation, but is simply an inference." As the circuit court correctly held, "a violation of a safety rule, regulation or statute based merely on an 'inference' does not satisfy the requirements of W.Va. Code § 23–4–2(c)(ii)(C)." *See Greene v. Carolina Freight Carriers*, 663 F.Supp. 112, 115 (S.D.W.Va.1987) (discussing fact that "deliberate intention" statute explicitly states that " 'regulation ... generally requiring safe [workplaces] ... is insufficient' " to establish this cause of action and finding that "statute or standard must *specifically* address the unsafe working condition in question"); *accord Mayles*, 185 W.Va. at 95, 405 S.E.2d at 22.

■ Appellants do not cite this Court to any statute, rule, or regulation that would refute the lower court's finding that "nothing contained in the applicable regulations expressly requires an employer to monitor specifically for these chemicals." Rather, they make generalized, unsupported assertions such as: "The failure to monitor was also contrary to the well-established principals [sic] of industrial hygiene, both as reflected in industry and in the OSHA regulations." Appellants rely heavily on the safety data sheets and try to infer some regulatory violation associated with such data sheets. The objective of the regulation addressing safety data sheets is clearly to inform employees regarding the identity and nature of specific chemicals being used, as well to identify associated health hazards of exposure. *See* 29 C.F.R. § 1910.1200(g). There is no allegation that ACF failed to prepare and use safety data sheets; instead Appellants seek to create from this informational-based responsibility a duty to separately monitor for isocyanates. No such duty exists. Arguably, any such duty would only arise under a generalized notion of providing a safe workplace and, as discussed above, a violation of such a general duty does not rise to the level of a "deliberate intention" action. *See* W.Va. Code § 23–4–2(c)(ii)(C).

Accordingly, we have no basis from which to conclude that the lower court was in error in ruling that Appellants had failed to establish a violation of any state or federal safety statute, rule or regulation or applicable industry standard.

### D. Intentional Exposure to Unsafe Working Condition

■ In arguing that they submitted sufficient evidence to meet the fourth prong of the "deliberate intention" statute, Appellants iterate their theory that the opportunity for exposure to harmful chemicals is all that is required to meet this hurdle. Rather than having any evidence of other ACF management directing Mr. Tolley to continue to work in a known area of excessive levels of isocyanates and be subjected to exposure to such harmful chemicals, Appellants cite to one sentence from a 1992 internal ACF memorandum as the necessary evidence of intentional exposure. *See supra* note 24. According to Appellants, it is ACF's failure to monitor for isocyanates, rather than a specific act, that constitutes the intentional exposure at issue.

This Court has previously discussed what type of evidence is necessary to meet the fourth prong of the "deliberate intention" standard. In *Mayles*, we found sufficient evidence was introduced where "management at the restaurant knew how the employees were disposing of the grease, knew that a previous employee had been injured by such practice, had received employee complaints about the practice, and still took no action to remedy the situation." 185 W.Va. at 96, 405 S.E.2d at 23. Similarly, in *Sias*, we held that the requisite intentional exposure prong had been met where the plaintiff produced evidence that his coal employer directed him to work in an unsafe mining area despite having actual knowledge of the probability and risk

of a coal outburst in that particular section of the mine. 185 W.Va. at 575, 408 S.E.2d at 327–28.

Fully recognizing that an allegation of intentional chemical exposure case is factually distinct from the restaurant and coal mining scenarios referenced above, nonetheless there still must be some evidence that, with conscious awareness of the unsafe working condition (here, it is allegedly excessive levels of isocyanates), an employee was directed to continue working in that same harmful environment. Of significance to the court below was the fact that other ACF supervisors worked in the same environment under the same conditions as Mr. Tolley, thereby similarly exposing themselves to the allegedly "harmful" chemicals. Rather than finding evidence of an irresponsible employer who failed to respond to safety concerns and identified problems, the trial court found that the evidence painted a picture of an employer that acted appropriately under the available information:

> The undisputed evidence indicates that in an effort to protect its employees from overexposure to various hazardous chemicals, ACF adopted and implemented various precautions and remedial measures, including adopting various policies and procedures relating to safety training, hazard communications, personal protective equipment, industrial hygiene and respirator usage. In addition, all exterior spray painting operations were conducted in enclosed or at least semi-enclosed paint booths, which were equipped with exhaust fans, make up air and water wash systems to reduce overspray. Spray painters were required to wear full protective paint suits, air hoods and air supplied respirators during painting operations. Other employees, like plaintiff James Tolley, who would occasionally and for brief periods of time go into a paint booth during spray painting operations were required to wear vapor cartridge respirators. This information certainly does not support a conclusion that ACF intentionally exposed plaintiff James Tolley to hazardous chemicals. Instead, it indicates that ACF acted to protect the safety of its workers, including James Tolley, even if in hindsight it ultimately turns out that ACF may have been wrong in any of its industrial hygiene practices or decisions.

The facts of this case are clearly not on the level of those discussed above in the *Mayles* or *Sias* cases where a conscious decision was made to require an employee to work in a situation that presented an unsafe working condition. In marked contrast to those decisions, this case is without a shred of evidence to suggest that ACF was aware of excessive levels of isocyanates, and when fully apprised of such information, then made a decision to subject Mr. Tolley to excessive levels of isocyanates. Under the facts of this case, we have no basis from which to conclude that the lower court was in error in ruling that Appellants had failed to establish that ACF intentionally exposed Mr. Tolley to a specific unsafe working condition.

### E. Proximate Causation

■ The lower court found that Appellants failed to prove the fifth prong of the "deliberate intention" standard based on the fact that their medical experts were unable to identify with the necessary specificity the cause of Mr. Tolley's medical condition.

> Plaintiffs have failed to establish proximate cause because plaintiffs' medical causation expert cannot identify the actual cause of the plaintiff's respiratory condition. Plaintiffs' medical expert simply opined that 'there were three potential causes' for the plaintiff's alleged aggravation of his preexisting asthma: exposure to phthalic anhydrides or isocyanates or chronic exposure to unidentified non-specific irritants.

In response to this finding, Appellants contend that by identifying exposure " to at least three different products that can cause his condition," they met the proximate causation requirement.

■ As the circuit court correctly ruled, "the law is clear that a mere possibility of causation is not sufficient to allow a reasonable juror to find causation." Just as Appellants relied solely on the "opportunity" for exposure in arguing that they demonstrated an unsafe working condition, they similarly rely on indeterminate expert testimony on causation that is based solely on possibility.

Critical to establishing exposure to a toxic chemical is knowledge of the dose or exposure amount and the duration of the exposure. *See Yeater v. Allied Chemical Co.,* 755 F.Supp. 1330, 1338 (N.D.W.Va.1991) (recognizing that critical factor in determining whether employee was exposed to unsafe working condition is evidence of intensity of exposure to chemicals or concentration levels). In this case, there is absolutely no evidence to demonstrate that Mr. Tolley was ever exposed to isocyanates. Without that crucial evidence and certainly without any indication of isocyanate antibodies in his blood, there is no basis from which a jury could begin to conclude that Mr. Tolley's breathing condition resulted from exposure to isocyanates.

Dr. Lockey, an expert witness upon whom Appellants rely for causation, testified that he had no knowledge of any of the factors that would impact on issues of exposure. For example, he did not know how often Mr. Tolley was in the Exterior Finish Booth where the HDI containing top coat was applied; how close Mr. Tolley was to the Prime Booth or to the paint sprayers; the type of ventilation equipment used; or the frequency and level of exposure. Acknowledging that this was a case of "potential exposure," Dr. Lockey based his causation testimony on Mr. Tolley's general representation that he "was in and out of the area on a regular basis." Other than a single pulmonary function test, Dr. Lockey did not review any of Mr. Tolley's medical records for the relevant time period.

Dr. Lockey, as the trial court specifically found, "testified that the plaintiff's current respiratory problems could be aggravation of preexisting asthma, predating his employment at ACF, exacerbated by non-specific irritants irrespective of any exposure at ACF to the chemicals at issue." Given the lack of any evidence of exposure in this case combined with the inability of Appellants' experts to connect his medical symptoms to the alleged exposure, we simply cannot find that the lower court erred in concluding that Appellants' "general conclusion [that Mr. Tolley had the opportunity for exposure to asthma sensitizers] does not establish actual exposure and does not satisfy the proximate cause requirement of the West Virginia Workers' Compensation Act."

█ As the trial court correctly recognized, this case, due to the lack of sufficient evidence meeting each of the five prongs of the "deliberate intention" standard, is one that squarely falls within the legislative mandate included in the subject statute: "[T]he court shall dismiss the ["deliberate intention"] action upon motion for summary judgment if it finds, pursuant to Rule 56 of the Rules of Civil Procedure that one or more of the facts required to be proved by the provisions of subparagraphs (A) through (E) of the preceding paragraph (ii) [W.Va.Code § 23–4–2(c)(ii)] do not exist." W.Va.Code § 23–4–2(c)(iii)(B).

Based on the foregoing, the decision of the Circuit Court of Kanawha County is hereby affirmed.

Affirmed.

McGRAW, Justice, dissenting.

(Filed Jan. 3, 2003)

In this case Mr. Tolley alleged that his employer allowed plant employees to be exposed to a toxic chemical, and that this exposure caused him harm. The lower court determined that Mr. Tolley failed to present sufficient evidence to withstand a motion for summary judgment. While I agree with the majority that Mr. Tolley has, thus far, only been able to produce limited evidence that his employer violated each element of our deliberate intent statute, I do not agree with the lower court's grant of summary judgment.

As this Court as often noted, when reviewing a motion for summary judgment, a court "must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion." *Painter v. Peavy,* 192 W.Va. 189, 192, 451 S.E.2d 755, 758 (1994). Mr. Tolley has produced substantial evidence that the chemical in question was present in the plant, that a different means of testing might be required, and that he has suffered an injury consistent with exposure to this chemical.

This Court has stated that "[e]veryone who has a good faith dispute requiring a decision by an impartial arbiter is entitled to his day in court." *Yost v. Fuscaldo,* 185 W.Va. 493, 500, 408 S.E.2d 72, 79 (1991) (quoting *Nelson v. Public Employees Insurance Board,* 171 W.Va. 445, 454, 300 S.E.2d 86, 95 (1982)). It is true that Mr. Tolley has suffered from asthma and has been a smoker for some time. Reasonable minds may differ as to the cause of his injury, the propriety of the steps taken by the employer to prevent exposure, or the likelihood of Mr. Tolley's personal, direct exposure to the chemical. However, I would prefer that those reasonable minds, that is members of the jury, be given a chance to consider the question.

Therefore, I respectfully dissent.