No. 17-0067 -    *FirstEnergy Generation, LLC v. James J. Muto and Carol Muto*

Davis, Justice,  dissenting:

I respectfully dissent from the majority opinion which utterly undermines the jury system.  The opinion glosses over the evidence of record and ignores conflicting testimony that is best assessed by the group of citizens who sat through some six days of trial and went to the FirstEnergy Harrison Power Station for a site view of the workplace location in issue.  It is the function of the jury to weigh the evidence, determine credibility, and evaluate conflicts in testimony.  When properly instructed on the law, the jury is the best evaluator of the evidence and for determining the existence of liability.  An appellate court should not substitute its cold paper record view of the evidence for that of the jury.  This Court must be reluctant and hesitant to overturn fairly tried jury verdicts.  We have long held that "the verdict of the jury will not be set aside unless plainly contrary to the weight of the evidence or without sufficient evidence to support it."  Syl. pt. 4, in part, *Laslo v. Griffith*, 143 W. Va. 469, 102 S.E.2d 894 (1958).  Moreover, this Court has often observed that "[i]t is the peculiar and exclusive province of the jury to weigh the evidence and to resolve questions of fact when the testimony is conflicting."  Syl. pt. 3, *Long v. City of Weirton*, 158 W. Va. 741, 214 S.E.2d 832 (1975).  Despite these clear holdings, the majority opinion in the case *sub judice* improperly invades the province of the jury in a fairly tried and properly instructed setting.

1

To begin, the majority has chosen to disregard the trial court's lengthy, well-reasoned Order Denying Defendant's Renewed Motion For Judgment As A Matter Of Law; Motion For A New Trial And Motion To Alter Or Amend Judgment. In his Order, the trial judge, in great detail, outlined the testimony, the evidence, the conflicts, and the credibility issues with specific citation to the record. Like the jury, the trial judge was present and aided by the "living courtroom." *Gasperini v. Center for Humanities, Inc.* 518 U.S. 415, 438, 116 S. Ct. 2211, 2225, 135 L. Ed. 2d 659, 680 (1996) (observing that the rulings of trial court judges are deserving of great respect as they consider the evidence in the setting of the "living courtroom"). Indeed, this Court has long held that:

> [T]he ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, [and] the trial court's ruling will be reversed on appeal [only] when it is clear that the trial court has acted under some misapprehension of the law or the evidence.

Syl. pt. 4, in part, *Sanders v. Georgia-Pacific Corp.*, 159 W. Va. 621, 225 S.E.2d 218 (1976). Here, the majority opinion afforded no respect and no deference to the trial judge whose considered order it simply ignored. My review of the some 2,000 page record compels me to conclude that the majority merely paid lip service to its cited syllabus point commanding,

> [w]hen this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the West Virginia Rules of Civil Procedure [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed

2

motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party.

Syl. pt. 2, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009). Instead of following the command of the law, the majority opinion reviewed the evidence in a light most favorable to the moving party. In so doing, it undermined the role and function of the jury and disregarded the trial court's considered judgment.

Additionally, the majority opinion falls woefully short in its failure to consider and apply the standard of review for FirstEnergy's motion for judgment as a matter of law after trial pursuant to Rule 50(b) of the West Virginia Rules of Civil Procedure:

> In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Syl. pt. 5, *Orr v. Crowder*, 173 W. Va. 335, 315 S.E.2d 593 (1983). Simply stated, the majority opinion gave all benefit to the non-prevailing party rather than to Mr. and Mrs. Muto where it properly belonged.

Mr. Muto suffered serious permanent injury, including a head injury, when he fell some fourteen feet through an unguarded opening in platform grating and landed two

3

levels below on a concrete floor. The fall occurred when Mr. Muto was attempting to diagnose and resolve a hazardous flyash dusting problem in connection with a major equipment change-out involving a rotary flyash feeder in a flyash silo at FirstEnergy's Harrison Power Station. The maintenance crew performing the equipment change-out had evacuated the silo due to the severity of the dust hazard. In evacuating the silo, the maintenance crew was unable to safely replace the grating thereby leaving an unguarded open hole hazard in violation of federal Occupational Safety and Health Administration (OSHA) regulations. Thus, the hazard of the dusting which resulted in near zero visibility was compounded by the emergent evacuation.

At the outset, as I consider whether the evidence was sufficient to support a jury verdict, I recognize that the situation encountered by Mr. Muto and the issue before the Court is not one of injury occurring during the course of employment. Rather, the question is one of statutory deliberate intention pursuant to which a plaintiff must prove each of five very specific statutory requirements in order to prevail. *See* Syl. pt. 2, *Helmick v. Potomac Edison Co.*, 185 W. Va. 269, 406 S.E.2d 700 (1991). Indeed, the Legislature mandated that our deliberate intention statutory scheme is intended to be of "narrow application and containing more specific mandatory elements than the common law tort system[.]" W. Va. Code § 23-4-2-(d)(1). I well-appreciate that principles of negligence do not apply to the statutory deliberate intention cause of action. Indeed, the threshold requirements that

4

plaintiffs must meet in deliberate intention cases is high and onerous. It is not, however, insurmountable. The West Virginia Workers' Compensation Act was designed to provide a system of compensation to injured employees while providing immunity to qualifying employers from employees' common law tort actions. W. Va. Code § 23-2-6. Nevertheless, the Legislature carved out an exception to that immunity with the deliberate intention statute. W. Va. Code § § 23-4-2(d)(2)(ii)(A)-(E). That exception must mean something. I fear, though, that in elevating itself to the position of superjury in considering the evidence, the conflicts, and the inferences in a fashion favorable to the employer, the majority is moving toward a *de facto* evisceration of the statutory deliberate intention cause of action.

I turn first to the statutory element of "actual knowledge." Prior to the term "actual knowledge" being amended into the deliberate intention statute, this Court had required that a plaintiff in a deliberate intention case prove actual knowledge on the part of the employer. The previous version of the statute did not use the term "actual knowledge," but, instead, required proof that the employer had a subjective realization and appreciation of the hazard. Nevertheless, this Court held that the requirement of subjective realization "is not satisfied merely by evidence that the employer reasonably should have known of the specific unsafe working condition and of the strong probability of serious injury or death presented by that condition. Instead, it must be shown that the employer *actually possessed* such knowledge." Syl. pt. 3, in part, *Blevins v. Beckley Magnetite, Inc.*, 185 W. Va. 633, 408

5

S.E.2d 385 (1991) (emphasis added). "The standard . . . to satisfy [subjective realization] is 'actual' knowledge. This is a high threshold that cannot be successfully met by speculation or conjecture." *Mumaw v. U.S. Silica Co.*, 204 W. Va. 6, 12, 511 S.E.2d 117, 123 (1988) (per curiam).

It is noteworthy that the trial judge properly and thoroughly instructed the jury on the element of actual knowledge:

> The Court instructs you, ladies and gentlemen, that the element of actual knowledge under the law is not satisfied merely by evidence that FirstEnergy should have known of the existence of the specific unsafe working condition, or that FirstEnergy should have known that the specific unsafe working condition presented a high degree of risk, and a strong probability of serious injury or death.

> The element requires proof that FirstEnergy had actual knowledge of all three components. The burden of proof on this element cannot be met by speculation or conjecture.

> The Court instructs you further that the Plaintiff must prove that management-level employees at FirstEnergy had actual knowledge of the alleged specific–the alleged unsafe condition.

> Plaintiff's burden is not met by proving that someone who is not a manager or a supervisor knew of the unsafe condition.

With respect to the element of "actual knowledge," the majority minimizes the extent of the dust problem during the change-out of the rotary feeder and concludes that the

6

dust only created a hazardous working condition once it increased to the point of zero visibility in the silo. This approach ignores the relevant facts that it was well-acknowledged by management that the job of replacing the feeder would necessarily result in significant dust creation even to the extent of necessitating shutting down the trains.

The testimony of the maintenance crew employees was that the work area became filled with flyash and was rendered dustier and dustier during the course of performing the equipment change-out. The testimony further established that once the rotary feeder was pulled out of position, the flyash poured out of the chute to such an extent that the crew could not see through the fog cloud of dust which was so thick witnesses likened it to being in the dark. The maintenance crew members testified that respirators became clogged so heavily that they could barely breathe. According to the testimony, the dusting occurred because once the rotary feeder or "guts" were removed, the seal was broken and the trains and screw conveyor acted like a dust conduit sending flyash dust up and out into the work area. The system was such that there was nowhere else for the flyash dust to go so long as the train and screw conveyor were operating.

To a person, whether managerial or hourly employee, the testimony was that if the train had been shut down, as requested, the flyash dust problem would have been alleviated as no flyash would have been carried through the feeders. Moreover, prior to

7

undertaking the major job of replacing the rotary feeder, management explicitly recognized the potential of creating a hazardous work condition. In a planning meeting prior to directing that the job commence, management stated that if the work area got dusty, the trains would be shut down! Indeed, even a cold record review conveys the sense that the testimony was so overwhelming regarding the nature of the work and the flyash problem that the great looming question at trial, repeatedly raised, but never answered, was why this major equipment change-out, posing significant dust hazards, was not performed on a Friday, Saturday, or Sunday when the trains are shut down so that no flyash would be moving through the system. The second overarching and unanswered question was why was the train not shut down upon the request of the crew.

Unlike the jury and the trial judge, who heard all the witness testimony and could make assessments regarding credibility and conflicting evidence, as well as having the benefit of a work site visit, the majority credited the testimony of the supervisor, Mr. Harley, who chose not to respond to the request to eliminate the dangerous dust hazard by shutting down the train and insisted he did not have "actual knowledge" that the dusting got as bad as it did. A brief outline of the testimony is necessary to demonstrate the fallacy of the majority opinion.

Mr. James was the control room operator who received the call from the maintenance crew requesting that the trains be shut down due to dust. Mr. James testified that he called Mr. Harley to inform him of the request. He also told Mr. Harley he was concerned that, as the control room operator who should know the nature of work being conducted, he had not been informed of the major task taking place. Mr. James indicated his belief that there were safety issues involved in the equipment change-out while the trains and screw conveyors were operating other than the dust hazard. These safety issues included working around open grating and hazards from dropping tools down into moving equipment. Instead of stopping the trains, Mr. Harley responded that he wanted to make an attempt at adjusting the dust collector in the pug mill so as to create more suction in an effort to pull dust from the silo.

According to the testimony of Mr. James, within ten minutes of their phone call, Mr. Harley came to the control room. Mr. James testified that, prior to the arrival of Mr. Harley, he discussed the alternative approach with Mr. Eakle, an operator. The two agreed that adjusting the dust collector would not work against the dust in the silo. Mr. James testified that he and Mr. Eakle explained to Mr. Harley that the alternative approach would not alleviate the dust because the dust collector fans were "lucky to pull the dust off the pug mill, which they're designed to do, let alone the three previous screws leading to that pug mill." Nevertheless, Mr. Harley did not shut down the train.

9

In his testimony, Mr. Harley placed the blame for the decision to check the dust collector in the pug mill rather than shutting down the train on Mr. James. Specifically, Mr. Harley testified that when Mr. James told him "just hang tight. He said [Mr. Muto] will be getting back with us in a few minutes. I decided–I decided to take a minute or two, or whatever it was going to be, and wait and see what Mr. Muto found." In the face of contradictory testimony from the witnesses, Mr. Harley also sought to shift blame for the failure to shut down the train to the employees when he testified that "I okayed to shut the train down. Anytime they were ready, shut her down." Yet, Mr. Harley also testified that he was waiting on somebody to tell him it was time to shut the train down. Significantly, the overwhelming testimony heard by the jury was that the maintenance crew workers at the site of the hazardous dusting already told Mr. Harley it was time when they made their request to shut down the train. The train was not shut down. Instead, the maintenance crew got a call asking how long the train would need to be shut down and informing them that an adjustment at the pug mill floor was going to be tried. The flyash dusting became so severe that the maintenance crew had to evacuate the hazardous work environment due to safety concerns. Indeed, the testimony was that the dust was so bad and the visibility so poor they needed to hurry out and that it was unsafe to attempt to replace the platform grating before

the evacuation.[1]  The testimony was uncontroverted that shutting down the train would have stopped the hazardous dusting.

Given these, and other relevant facts ignored by the majority opinion, and properly considering the evidence in the light most favorable to Mr. and Mrs. Muto, it is clear that any properly instructed, reasonable jury readily could conclude that Mr. Harley had actual knowledge of the hazardous condition of the dusting and of the request to alleviate the hazardous condition by stopping the train.  Nevertheless, Mr. Harley failed to shut down the trains even in the face of managerial recognition in the planning meeting that the trains may

---

[1]I would be remiss if I did not briefly address the issue of the open and unguarded platform grating.  Mr. Muto's expert, David J. Bizzak, PhD, testified regarding the OSHA standards for elevated work surfaces where there is to be an opening.  His testimony in this regard was unrebutted, and even supported by FirstEnergy management witnesses.  The testimony was that an individual must attend such an opening at all times.  The requirement is that barricades must be erected around such openings.  The barricades must have top and mid rails erected so as to prevent entry and to be stable.  Additionally, there must be red danger tape placed around the barricade and a placard that describes the danger.  None of those requirements were met in connection with the openings in the platform grating that Mr. Muto fell through after the maintenance crew fled the area because they could not see and could barely breathe due to the volume of the flyash dust.  Unguarded, cable come-alongs, with no railings and yellow caution tape with no informational placard, violated both OSHA regulations and FirstEnergy's own rules.  Cables with caution tape do not constitute a robust barrier.  In fact, cables simply do not constitute a barricade.  Moreover, the rules at FirstEnergy were that yellow tape signaled "caution" and employees were permitted to proceed beyond yellow caution tape.  Logically believing that the caution was about the dust he was to investigate and stop, Mr. Muto crossed the yellow tape and dropped through the opening. Mr. Muto, a twenty-three year employee with safety awards, unequivocally testified that he would never have crossed a red danger tape.  The majority opinion is tone deaf in its suggestion that Mr. Muto, who was performing his assigned job duties, was responsible for his own serious injury.

11

need to be stopped due to the flyash dust hazard. The majority opinion is just plain wrong when it focuses on the evacuation as the point in time at which the situation became hazardous.

Turning to the issue of "intentional exposure" to the hazardous work conditions, the majority opinion places undue significance on testimony that no management employee specifically instructed Mr. Muto to go to the silo where the feeder was being replaced and where the dusting was resulting in a hazardous working environment. At the same time, the majority ignores the evidence of what was required of Mr. Muto in investigating the dust and dismisses conflicting testimony regarding Mr. Harley's interactions with Mr. Muto. As I noted, Mr. Harley testified that he was waiting to see what Mr. Muto found.

Closely connected to the requirement of actual knowledge is the statutory element that the employer intentionally exposed the employee to the specific unsafe working condition. W. Va. Code § 23-4-2(d)(2)(D). The intentional exposure element is not met by a showing of inadvertence or negligence. *Accord Sias v. W-P Coal Co.*, 185 W. Va. 569, 575, 408 S.E.2d 321, 327 (1991). Here again, the trial court thoroughly instructed the jury on the law:

12

The Court instructs you that the element of intentionally exposing an employee to the specific unsafe working condition is linked particularly with the actual knowledge requirement.

That is, an employer cannot intentionally expose an employee to a specific unsafe working condition that presented a high degree of risk and a strong probability of serious injury or death, if the employer did not have actual knowledge of the existence of the specific unsafe working condition, and that the unsafe working condition presented a high degree of risk and a strong probability of serious injury or death.

This element is not satisfied, if the exposure to the alleged specific unsafe working condition was inadvertent, the result of negligence, gross negligence, or even willful, wanton, or reckless misconduct by the employer.

Rather, the Plaintiff must prove that management or supervisors at FirstEnergy intentionally exposed the Plaintiff to the specific unsafe working condition alleged, even though FirstEnergy had actual knowledge of the existence of the specific unsafe working condition, and had actual knowledge that the specific unsafe working condition presented a high degree of risk and a strong probability of serious injury or death.

Thereafter, the trial court gave lengthy instructions explicitly distinguishing deliberate intention from negligence.

My review of the evidence submitted at trial supports the conclusion that the jury reasonably could weigh the evidence and resolve questions and conflicts on the issue of intentional exposure in favor of Mr. and Mrs. Muto. Mr. Harley testified that he was never in the control room and did not see, speak to, interact with, or instruct Mr. Muto to do anything. According to Mr. Harley, he did not speak to Mr. Muto until after he saw him

13

laying on the floor in the silo. Thus, the contention was that Mr. Harley did not instruct Mr. Muto and could not intentionally expose him to the hazardous conditions in the silo. But, Mr. James testified that Mr. Harley was in the control room when Mr. Muto was in the control room. Mr. James acknowledged that shortly after the injury to Mr. Muto, he gave a statement specifically providing that Mr. Muto left the control room to go to the flyash silo to assess the dusting problem. Mr. James explicitly testified that if an employee is to troubleshoot a problem, the employee must go to the source of the problem. In short order, to investigate and correct the dust hazard in the silo, an employee would need to go to the silo.

Mr. Eakle, now a managerial employee rather than an hourly employee, initially testified that Mr. Harley was not in the control room. When confronted with his statement given shortly after the injury, Mr. Eakle agreed that his memory would have been better at that time when he reported that there were conversations between Mr. Muto and Mr. Harley in the control room regarding correcting the dust problem in the silo. Further, Mr. Eakle testified that he and Mr. Muto left the control room together, and he assumed that Mr. Muto was "headed up there to check out what the maintenance men–the fly ash, what they called down, they needed somebody to check on. I just assumed that was where he was headed." Mr. Eakle also confirmed that in order to diagnose the problem, troubleshooting by the employee would be necessary.

14

Notably, Mr. Harley's testimony as to even being in the control room was contradictory. He first testified that he never went to the control room. He then testified that he "could have been" in the control room with Mr. Muto. Further, Mr. Harley's testimony was evasive regarding knowledge of the whereabouts of Mr. Muto. He denied knowing that Mr. Muto was in the silo investigating the dust hazard. Yet, in the next breath, Mr. Harley stated that he did not know Mr. Muto was "in the silo for sure." Rather, Mr. Harley testified that "I knew he could be there." A reasonable jury could conclude that the only reason Mr. Harley knew that Mr. Muto "could be" in the silo is that he knew Mr. Muto was doing the job he was tasked with in terms of investigating the dust hazard against a backdrop of that hazard existing in the silo. Specifically, Mr. Harley testified that he knew Mr. Muto went to see what was going on and would be getting back to them. Mr. Harley affirmed in his testimony that the first step would be to check to make sure the drain was not plugged or the water level too high with the dust collector. If that was satisfactory, the next place for Mr. Muto to go would be the flyash silo where the dust hazard existed.

Regrettably, Mr. Muto could not recall any discussions with Mr. Harley. He testified that he went to the flyash silo because his job task was to "get the dust down, stop the dust problem that the maintenance were complaining about." He knew the maintenance crew requested that the train be shut down and that was not done. Thus, he was "to check to see the problem, and see if I could solve it. That's the job–that I do." Like Mr. James, he

also testified that the dust in the silo could not be reduced by making adjustments to the pug mill dust collector which reduces in the pug mill, but is incapable of drawing dust from the silo area. Mr. Muto further testified that he was never informed, and did not know, that the maintenance crew was in the silo for the purpose of removing the rotary feeder. Significantly, Mr. Muto would have had no need to go to the silo to investigate the source of the hazardous dust levels if he had been informed of the rotary feeder replacement. On cross-examination, Mr. Muto testified:

> Q. You knew–when you were going into that silo, that the maintenance crew had been up there trying to remove the rotary feeder, right?
>
> A. No.
>
> Q. Oh, you didn't know that?
>
> A. If I'd have known that, I wouldn't have gone up there, because I would immediately have know the problem–
>
> Q. Okay. So–
>
> A. –with that big hole open.
>
> Q. I'm sorry. I didn't mean to cut you off. Go ahead. Say that again.
>
> A. I said, if I'd have known they were removing that feeder, I wouldn't even bothered going up there, because I would have known why the dusting was occurring.

Given such testimony, the jury and the trial court could reasonably conclude that Mr. Muto's job of finding and stopping the dusting hazard constituted an intentional

exposure to the known hazards of the flyash dusting in the silo. The jury readily could conclude that Mr. Harley approved the investigation of the problem and was waiting on Mr. Muto to report his findings. The jury could reasonably find intentional exposure in concluding that Mr. Harley chose the option of investigating the dust to try other measures of dust reduction rather than stopping the trains and, hence, the dust. *See Sias v. W-P Coal Co.*, 185 W. Va. 569, 408 S.E.2d 321 (observing that a reasonable jury could find intentional exposure when the employer had three options and chose the one that exposed the employee). The approach of the majority strains the deliberate intention cause of action. The approach improperly would require that, in the face of actual knowledge of a specific unsafe working condition, a plaintiff would have to prove specific and discrete supervisory instruction task-by-task and step-by-step in order to prove the intentional exposure element. That is simply not the law and not the reality of industrial workplace environments. I have previously written that "we simply cannot condone any employer's attempt to avoid an otherwise viable deliberate intent action by conducting itself 'like the proverbial ostrich who sticks his head in the sand to avoid seeing the obvious[.]'" *Ryan v. Clonch Indus., Inc.* 219 W. Va. 664, 674, 639 S.E.2d 756, 766 (2006) (citation omitted). The source of the problem was known to management and identified at the planning stage, and, as had been anticipated, the request to shut down the trains due to the hazard was made. Indeed, the jury reasonably could have interpreted the testimony of Mr. Rapp, the supervisor of the maintenance crew, as supporting a finding of intentional exposure to the flyash dusting hazard. Mr. Rapp testified that "[i]t

17

would have been easier to shut it down from the control room than to send somebody into a hazardous environment." A trier of fact reasonably could conclude that not only was it easier to shut the trains down from the control room, but that it was decidedly safer than intentionally exposing Mr. Muto to a workplace hazard–a specific unsafe working condition.

In conclusion, my considered review of the record reveals no error or irregularities suggesting that the verdict of the jury should be invalidated. This case was fully, vigorously, and fairly tried by the parties. The instructions fairly reflected the elements of the deliberate intention claim. A special verdict form with separate interrogatories tracking the five elements of the claim properly was provided to the jury. There is nothing remotely suggesting that the trial judge, in reviewing the propriety of the verdict, acted under any misapprehension of the law or the evidence presented. The evidence and witness testimony on significant issues fundamentally differed. Some testimony was contradictory. Some witnesses contradicted themselves. Some witnesses had their recollections refreshed with statements given shortly after the incident and did not disavow the earlier statements. A site review of the workplace including the flyash silo, the trains, the screw conveyors, the control room, and the pug mill provided the jury a working picture of the facility that added context to the testimony. It is the role of the jury to evaluate and sort out conflicts in the factual development, assess credibility, and resolve conflicts. My review instructs that the jury properly performed their role and duty. In this case, with a highly result-oriented

18

opinion, the Court blatantly stripped the jury of its proper function in our system of justice. Because this approach is blatantly wrong and contrary to the established precedent of this Court, I dissent.